Mark AHLQUIST, as next friend, parent and guardian of Jessica Ahlquist, a minor, Plaintiff,

v.

CITY OF CRANSTON, by and through Robert F. STROM, in his capacity as Director of Finance, and by and through the School Committee of the City of Cranston, and School Committee of the City of Cranston, by and through Andrea Iannazzi, in her capacity as Chair of the School Committee of the City of Cranston, Defendants.

No. CA 11–138L.

United States District Court, D. Rhode Island.

Jan. 11, 2012.

Order Denying Reconsideration April 12, 2012.

**510**

Lynette J. Labinger, Roney & Labinger LLP, Thomas R. Bender, Hanson Curran LLP, Providence, RI, for Plaintiff.

Joseph V. Cavanagh, III, Joseph V. Cavanagh, Jr., Blish & Cavanagh, LLP, Providence, RI, Lori H. Windham, The Becket Fund for Religious Liberty, Washington, DC, for Defendants.

### DECISION AND ORDER

RONALD R. LAGUEUX, Senior District Judge.

This matter is before the Court on Plaintiff's Motion for a Permanent Injunction, demanding that Defendants remove or alter the Christian prayer that is affixed to the wall of the auditorium in one of the City of Cranston's public high schools. Defendants include the City of Cranston, Rhode Island, and its School Committee. Plaintiff Jessica Ahlquist (hereinafter "Plaintiff") presently attends the high school, known as Cranston High School West (hereinafter "Cranston West"), as an eleventh grader. Defendants, who have refused to alter or remove the prayer, now argue that Plaintiff does not have the requisite standing to bring her complaint. In addition, Defendants argue that the prayer, which dates back to the early 1960s, is an historical memento of the school's founding days, with a predominantly secular purpose.

After Plaintiff filed her Motion for Preliminary Injunction, the parties agreed that the Motion be consolidated with the trial on the merits, and stipulated that documentary evidence, including depositions, be presented to the Court in lieu of live testimony. A hearing took place on October 13, 2011, preceded by a judicial view of Cranston West. The issues have been fully briefed, the Court has reviewed the evidence, and the matter is now in order for decision. The Court rules that Plaintiff has standing in this matter and rules in her favor on the merits of this dispute. The Court also orders the immediate removal of the Prayer Mural from the auditorium at Cranston West.

### Background

Cranston West opened in the fall of 1959 to accommodate the growing suburban population of Cranston, Rhode Island. Prior to the opening of Cranston West, the City's high school students had all attended Cranston High School, which then became designated as "Cranston East" to reflect its geographic location. Cranston West was constructed in phases, with the stand-alone auditorium building opening in the fall of 1963. In its early days, Cranston West's population included junior high school students. The first group of high school graduates was the Class of 1963.

### The Prayer's origins

During the school's first academic year, only seventh and eighth graders were in attendance. The student council selected the school's mascot and team colors, and a seventh grader by the name of David Bradley was assigned the task of authoring the school's creed and school prayer. As was the wide-spread custom of the time, Cranston West opened its school day with the recitation of the Lord's Prayer. Those who attended Cranston West in those days recall that it was the short

version of this prayer, commonly known as the Catholic version. The Protestant version is longer, but both begin "Our Father which art in heaven." This is the prayer that Jesus taught to his disciples. In 1960, after the School Prayer was adopted by Cranston West's student council and approved by the school's administration, then it was recited in homeroom or over the public address system each day, instead of the Lord's Prayer. Around 1962, this practice was discontinued and replaced by a moment of silence, as a result of the U.S. Supreme Court's decision in *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), which held prayer in public schools to be constitutionally impermissible.

In the beginning of the 1963–64 academic year, at a school-wide assembly, the Class of 1963 presented to the school a gift of two murals, one with the school creed and one with the School Prayer, to decorate the walls of the new auditorium. The murals had been painted by a professional, and were installed on either side of the auditorium's stage. Although the plans for the murals had been approved by the school administration at every phase, all the expenses of creating the murals were paid through fund-raising undertaken by the Class of 1963.

### The Prayer Mural now

The murals are large, approximately 8 feet in height and 4 feet wide. According to some witnesses, their text is visible throughout the auditorium, and legible from much of the room because the lettering is large; each letter is approximately 3 inches tall and 2 inches wide. The murals are painted on paper, and affixed directly onto the auditorium's walls. Someone with a first-hand memory recalled that a border had originally been painted around the edge of the murals, along with a notation that they were gifts of the Class of 1963. However, since then, presumably when the auditorium walls were repainted, the borders and gift notations were painted over. Now, as paint covers the edge of the murals, it appears that the text has been painted directly onto the wall.

Each mural bears an illustration at the top, a title, then the text below. The Prayer mural hangs on the right-hand side of the stage, next to the clock, and reads as follows:

SCHOOL PRAYER

OUR HEAVENLY FATHER,
GRANT US EACH DAY THE DESIRE TO DO OUR
BEST,
TO GROW MENTALLY AND MORALLY AS WELL AS
PHYSICALLY,
TO BE KIND AND HELPFUL TO OUR
CLASSMATES AND TEACHERS,
TO BE HONEST WITH OURSELVES AS WELL AS
WITH OTHERS,
HELP US TO BE GOOD SPORTS AND SMILE
WHEN WE LOSE AS WELL AS WHEN WE WIN,
TEACH US THE VALUE OF TRUE FRIENDSHIP,
HELP US ALWAYS TO CONDUCT OURSELVES SO
AS TO BRING CREDIT TO CRANSTON HIGH
SCHOOL WEST.
AMEN

Currently, the auditorium is used frequently by the student body for mandatory assemblies, as well as non-required extra-curricular activities. The auditorium is also used by the faculty, parents and other members of the community. Plaintiff testified that she attended eight to ten events in the auditorium during her freshman year.

### Other school decor

The text of the School Creed, which hangs on the left-hand side of the stage, is not the subject of the present dispute because it contains no religious references.[1] The auditorium walls are also lined with decorative cloth banners, gifts from subsequent graduating classes, that bear no message beyond, for example, "Class of 1986." Other class gifts, monuments and markers can be found at other locations around the school. Several trophy cases line the corridor by the office in the main building of the school.

The entrance to the school is decorated with a series of large banners, suspended from the vaulted ceiling. These banners each bear a large paragraph-length message which Defendants explain are the standards issued by the New England Association of Schools and Colleges, with titles such as the "Student Mission Statement" and a "Statement of Civic Expectations." These mission statements, along with the School Creed, are reprinted each year in the handbooks that are distributed to all students. At his deposition, School Committee Member Frank Lombardi opined that the Prayer Mural is an historic relic, and is readily distinguishable from other "modern-looking" banners throughout the school, that bear contemporary messages of inspiration for the student body, because the Prayer Mural is "old-looking."

### The Plaintiff

Plaintiff entered Cranston West in the fall of 2009 as a ninth grader. That spring a friend pointed out the School Prayer to her, as she had not noticed it beforehand despite attending several assemblies in the auditorium. As a child, Plaintiff was a Catholic, but at age ten or eleven she became an avowed atheist.[2] She testified at her deposition that she was upset when she realized that there was a Christian prayer displayed in her school, and she experienced feelings of exclusion and ostracism. She began to talk with her family and with her friends and peers at school about the Prayer Mural. Many students were offended by her objections to the Prayer Mural, and some did not hesitate to demonstrate their disrespect for her feelings. During the summer, Plaintiff learned that someone else had complained about the Prayer Mural to the American Civil Liberties Union ("ACLU"). Indeed, Defendants explain that, in July 2010, they received a letter from the ACLU complaining about the Prayer Mural, written on behalf of an unnamed family with two children in Cranston public schools. Also that summer, Plaintiff started an on-line Facebook page dedicated to a discussion of the Prayer Mural. It appears from various references in the record that there was press coverage about the issue during the summer, in the local Cranston weekly paper, in the Providence Journal, and in national news as well.

### The School Committee meetings

By the time the School Committee convened to address the ACLU's letter, on August 16, 2010, the debate had already become heated, and many members of the community attended the meeting and spoke about the Prayer Mural. The first two speakers were the Reverend Dr. Donald Anderson, Executive Minister of the

---

**1.** Although David Bradley stated at his deposition and before the School Committee that he recalls drafting the School Creed, its text is the same as the text of the School Creed which, along with a School Prayer, have been displayed at Cranston's Hugh B. Bain Middle School since the 1920s. The Bain School Prayer also opens with "Heavenly Father." Both Bain murals were removed from that school's walls as this litigation commenced.

**2.** An atheist does not believe in the existence of a supreme being.

Rhode Island State Council of Churches, and Rabbi Amy Levin of Temple Torat Yisrael in Cranston, Vice President of the Rhode Island Board of Rabbis, both of whom expressed the point of view that the Prayer Mural should be altered or removed. Two more speakers agreed; one of whom was interrupted from the floor, compelling the School Committee Chair to call for order. Seven people spoke in favor of the Prayer Mural remaining. Four more speakers were on the fence, wanting the Mural to stay but also wanting to avoid a lawsuit. After the public comment portion of the meeting concluded, the School Committee addressed Superintendent Peter Nero's resolution that a subcommittee be formed to reword the Prayer in order to convey its message without religious references. Stating, "I cannot leave God at the doorstep because I believe in God. I'm very religious and I pray every day," School Committee member Lombardi offered an amendment that the subcommittee also consider leaving the Prayer Mural up and that the subcommittee be tasked with researching options for defending the ACLU's potential lawsuit. The resolution, with the amendment, was then passed unanimously.[3]

The subcommittee met, in a public forum, in November 2010 and February 2011. At the November meeting, subcommittee members initially focused on the idea of rewording the Prayer to remove religious references. However, some on the subcommittee wanted first to explore the option of donated legal services that would enable Cranston to defend the Prayer against a possible lawsuit without incurring costs. Several speakers from the public contributed, including Plaintiff who professed her atheism and opposition to the presence of the Prayer Mural. Plaintiff recalled later that she received an an-

gry response from others in the audience. One citizen, who spoke after Plaintiff, suggested that, "If people want to be Atheist, it's their choice and they can go to hell if they want." At the end of the meeting, Plaintiff and her companion, who had also spoken out against the Prayer Mural, were escorted from the meeting by the police because of concerns for their safety.

At the February meeting, Plaintiff spoke again. Two speakers who followed Plaintiff suggested that she be charged with a hate crime. Although members of the subcommittee urged speakers to address their remarks to the committee, many of the speakers looked directly at Plaintiff when it was their turn to speak. Almost all of the speakers referenced their personal religious beliefs. For example, one speaker stated:

Jesus said, if you are ashamed of me, I will be ashamed of you before my Father. Not ashamed, please pass this on. I do believe this. People forget that we were born under God Almighty. If it wasn't for God Almighty we wouldn't be here. It's just like I keep saying to everybody else and everything there is, "You can have your fun here on earth but on Judgment Day you're going to be standing before God Almighty and you're going to say ... you know he's going to say ..." I don't know what he's going to say but all I know is that you're going to be happy to see Him face to face.

On March 7, 2011, the full School Committee met in order to listen to public comments again, and review the subcommittee's recommendation. Eight students spoke; four in favor of the retaining the School Prayer Mural and four, including Plaintiff, requesting that it be removed. The student speakers were followed by

---

**3.** School Committee member Steve Stycos cast the sole vote against the amendment in a separate roll call; then voted with the others in favor of the resolution as amended.

twenty-six adult speakers, from Cranston as well as other communities. Of those speakers, twenty-four spoke in favor of retaining the Prayer Mural. Only two were against. A video recording of the meeting reveals a rowdy and belligerent atmosphere. Speakers in favor of retaining the Prayer Mural were often interrupted by calls of "Amen" from the audience, and they were usually followed by loud applause and whoops. The speakers who favored the Mural's removal were booed. Several of the speakers pointed to Plaintiff and her companions while angrily lambasting her point of view, though at least one of these speakers was instructed by a School Committee member to address her remarks to the Committee. Several speakers suggested that Plaintiff and others like her should try looking at the blank wall, rather than at the School Prayer, if they were bothered by it.

The majority of the speakers described their own religious beliefs and the importance of religion in their lives, and several quoted from the Bible. Many expressed their opinion that the Prayer was non-denominational and that the Prayer reflected important secular values shared by all members of the Cranston community—values that they wanted imparted to their children. In this vein, a few speakers mentioned that they remembered the days when prayers were recited in school, and that it wasn't a big deal and no one minded, including Jewish students.

One speaker said, "If you take the banner down, you are spitting in the face of Almighty God." She continued:

As far as the atheists, you know what? You're entitled to your opinion however wrong you are. But the fact of the matter is, God exists ... If this banner is taken down, you are indeed establishing a bunch of people who are not going to believe in God, and on Judgment Day,

you will be judged because you stand before Almighty God.

Several speakers talked about the importance of adhering to one's religious beliefs in all aspects of one's life. "You're not a part-time Catholic; you are a Catholic," one speaker said, "You can't vote to take this down and say that you're standing with God." Another speaker implored the School Committee to retain the Prayer Mural, "Don't check your morals at the front door ... Please don't ruin our way of life." The final speaker, a self-described atheist, nonetheless threatened that if the ACLU came to take down the Prayer Mural, he would assemble a group of people to surround the school and protect the Mural.

At the conclusion of the public comment, School Committee member (and former mayor) Michael Traficante explained that the subcommittee had been instructed to consider three options: 1) keep the Mural; 2) remove the Mural; or 3) alter the display by either changing the text to remove religious references or by adding additional banners representing other religions. Traficante reported the subcommittee had decided to recommend that the Prayer Mural be retained as is. Following another round of enthusiastic applause, the School Committee and administrators had the opportunity to express their views.

First, Peter Nero, the superintendent of schools for the City, described the importance of Catholicism to him and his family, and his life-long commitment to his religious faith. He stated that he had initially been concerned about the potential costs of defending a lawsuit, but he had ultimately decided to recommend that the Prayer Mural be retained.

Lombardi, who opened his remarks by commending all the students who spoke, also described himself as a practicing Catholic. Stating that he would vote in

favor of retaining the Prayer Mural, he explained that he believed the Prayer to be innocuous because it was non-denominational, as the notion of 'Heavenly Father' was common to many religions. Later, at his deposition, Lombardi declared that his intent in voting to retain the Prayer display was a secular one. He stated further that he believed that this was the case for all of the School Committee members who voted to retain the Prayer: "... I clearly believe that the School Committee acted the way it did because of the context of this particular tablet on this particular wall and its historical significance, and it had nothing to do with religion at all."

Traficante spoke next and began by describing himself as "a person of faith." A former coach, he recalled always opening sports events with a prayer. "Not to offend," he said, "but to pray to keep them safe during that athletic event ... Not to offend, but to provide a spiritual message of hope." Expressing his opinion that the Prayer was non-denominational and non-discriminatory, Traficante indicated that he would vote to retain the Prayer Mural. Stephanie Culhane also prefaced her remarks with testimony concerning her religious faith, and her experiences teaching religious education to children. However, she admonished the group for being judgmental and suggested that many in the crowd were not modeling the tolerant behavior endorsed by Jesus Christ. She went on to discuss the financial straits confronting the school department, and, as the crowd booed her, Culhane indicated that she would vote to remove the Mural because it was a financial gamble that she didn't want her own children and the district's children to have to pay.

Janice Ruggieri also expressed that she felt many in the audience were intolerant, which was demonstrated by their recommendation that those students who were offended by the Prayer should simply 'look the other way.' She indicated her intent to vote to remove the Prayer Mural. Next, Steven Bloom explained that he was Jewish, and that prayers in his faith do not reference 'Heavenly Father.' Nevertheless, he explained that he did not find the Prayer offensive, and he recalled growing up during a time when Jewish religious observances were routinely overlooked at public school. However, he offered, those times were different. He expressed his belief that the School Committee was limited in its potential responses by the threat of a lawsuit, and that he would have favored some intermediate step, such as hanging additional banners representing other religions. He concluded that he intended to vote to take the Prayer Mural down, because he could not support it, "even if it's just one person who's offended by it." At that point, Culhane interjected that a retired art teacher had suggested to her that the School take the Prayer Mural down and reproduce it in a smaller form, frame it and place it with other of the school's historical mementos. This suggestion was roundly booed by the audience.

Paula McFarland explained that one of her parents was Jewish, but that she was not religious. Nonetheless, she recognized the importance of tradition in the school and suggested that every student who makes a contribution to the school deserves to have it honored. Her vote would be to retain the Prayer Mural. The floor then went to the School Committee chairwoman, Andrea Iannazzi, who noted with some chagrin that the vote was three to three. She explained that she would break the tie by casting the fourth vote to retain the Prayer Mural, because it represented tradition and a commendable code of morals. With that, a quick roll call vote formalized these view points, and the three-hour meeting was adjourned.

Following this meeting, Plaintiff reports that she experienced bullying and threats at school, on her way home from school and on-line.

The School Committee met again on March 21. At that meeting, the School Committee members approved a resolution to place an explanatory marker next to the School Prayer Mural in order to:

> ... guarantee that student works of excellence be protected and conserved for current and future generations, and for historic and cultural reasons, without promoting any ethnic, political or religious content, element or elements contained or perceived to be contained therein.

In early 2011, the ACLU contacted Plaintiff and asked her if she would serve as the plaintiff if a lawsuit were filed. Plaintiff agreed, and this suit was filed on April 4, 2011, with Plaintiff's father acting as her "next friend."

### Plaintiff's public comments

Since the lawsuit was filed, Plaintiff has had several occasions to speak in public about her views and experiences. At her deposition, Plaintiff described herself as an activist working toward the removal of religious references from government. She also testified that, when she first saw the Prayer Mural, it made her feel "excluded, ostracized and devalued."

Interviewed on a local radio show, Plaintiff confessed that she didn't like the Catholic Church, which she described as hypocritical. When asked about the Prayer, she said that the Prayer was not offensive and that its message was a positive one. She continued, "Yeah, I'm not offended by it, but you can't—can't violate the Constitution." When asked about this statement during her deposition, Plaintiff explained that she was trying to demonstrate a detached, "grown-up" attitude about the dispute, particularly in light of the very personal harassment that she had experienced

after publicly expressing her views. After Plaintiff's public comments before the School Committee, and particularly after the lawsuit was filed, Plaintiff was subject to frequent taunting and threats at school, as well as a virtual on-line hate campaign via Facebook.

In a May 24, 2011, affidavit, Plaintiff recounts a mandatory assembly that she attended in the auditorium at Cranston West in April 2011, after the lawsuit was filed. At that assembly Cranston's Mayor Allan Fung was asked by a student about his views on the Prayer Mural. To loud applause, Mayor Fung responded that he wanted the Mural to stay right where it was. Plaintiff recounts that she felt devalued, "horrible, very uncomfortable, alone and isolated." The assembly in question was Cranston West's "Diversity Week" educational program; and Mayor Fung had spoken about the difficulties he had faced as a Chinese–American in the world of politics.

### Analysis

### I. Standing

Defendants argue that Plaintiff does not have standing to bring this lawsuit. Defendants point out that Plaintiff must demonstrate a real and actual injury-in-fact in order to establish proper standing; a mere philosophical or political disagreement is insufficient. Defendants argue that neither Plaintiff nor her father, co-Plaintiff Mark Ahlquist, can show an actual injury. Moreover, if Plaintiff has no standing, then her father cannot derive standing from his status as her Next Friend; nor does he have taxpayer standing, as the Prayer Mural was privately funded.

According to Defendants, Plaintiff conceded that she has suffered no actual injury when she stated several times during the radio interview that she did not find the School Prayer offensive, and that her

sole objection was that she believed the display to be unconstitutional. In addition, Defendants argue, Plaintiff cannot point to any changes in her behavior made as a consequence of the Prayer Mural. She didn't even notice the Mural during much of her freshman year. After a friend called her attention to it, she made no immediate complaint and admitted later that she didn't really think much about it at first. Plaintiff continued to attend both mandatory and optional events in the auditorium, making no effort to avoid the Mural.

In response, Plaintiff argues that she has experienced the type of injury that courts generally look for in Establishment Clause cases, which is commensurate with the impact of the constitutional violation in question.

■ Standing is a threshold jurisdictional issue which must be resolved prior to an examination of the substantive issues in this dispute. If Plaintiff has no standing, then this Court may not proceed because it has no jurisdiction over the lawsuit. Article III of the United States Constitution confines the jurisdiction of this Court to the resolution of cases and controversies. *Valley Forge Christian College v. Americans United for the Separation of Church and State, Inc.*, 454 U.S. 464, 471, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). This means that the Court may not opine on the constitutionality of actions undertaken by legislatures, or municipalities, but may only address those issues within the context of a "real, earnest and vital controversy." *Id.* at 471, 102 S.Ct. at 758 (*quoting Chicago & Grand Trunk R. Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1892)). In *Valley Forge Christian College*, the Supreme Court wrote:

> The exercise of judicial power, which can so profoundly affect the lives, liberty, and property of those to whom it ex-

tends, is therefore restricted to litigants who can show "injury in fact" resulting from the action which they seek to have the court adjudicate.

*Id.* at 473, 102 S.Ct. at 759. The Court went on to explain that "the concept [of standing] cannot be reduced to a one-sentence or one-paragraph definition," *id.* at 475, 102 S.Ct. at 760, but that it is more "than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485, 102 S.Ct. at 765.

### *Injury in fact*

■ To determine whether or not a plaintiff has standing, the First Circuit employs a three-part test, derived directly from the Supreme Court's jurisprudence. *Industrial Communications v. Town of Alton, N.H.*, 646 F.3d 76, 79 (1st Cir.2011) (*citing Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992)). The plaintiff must have suffered 1) an injury in fact; 2) which is caused by the offending conduct; and 3) which is capable of being redressed by a favorable court decision. *Id.* The inquiry here focuses on the injury-in-fact prong, because if Plaintiff can establish that she has suffered such an injury, it is undisputed that the injury has been caused by the presence of the Prayer Mural at her school, and will be ameliorated by its removal or alteration.

In his concurring opinion in *Lujan v. Defenders of Wildlife*, Justice Kennedy elaborated on the 'injury-in-fact' requirement, stating that a plaintiff must:

> ... demonstrate a personal stake in the outcome.... Abstract injury is not enough. The plaintiff must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct and the injury or threat of inju-

ry must be both real and immediate, not conjectural or hypothetical.

504 U.S. at 579, 112 S.Ct. at 2146 (internal quotations and citations omitted). All of these terms, such as "personal stake," "abstract injury" or "direct injury," are subject to varying interpretations, and those differences in interpretation are readily apparent in the divisive decisions that comprise the Supreme Court jurisprudence on standing. Rather than 'cherry pick' phrases from the Supreme Court cases and try to match Plaintiff's plight to the phrase, the analysis is better served by an examination of the specific factual circumstances of several Supreme Court cases, and a comparison of the facts where the Court determined that standing was present with those where it was not.

In *Lujan*, plaintiffs were wildlife conservationists concerned about the Department of the Interior's amended regulations that rolled back a requirement that it review the impact of its construction projects on endangered wildlife species. The proposed amendment concerned construction projects funded by the U.S. government, but located in foreign countries. Plaintiffs testified that they had traveled, and hoped to travel again, to countries where U.S. government-funded projects were damaging wildlife habitats. A majority of the justices concluded that plaintiffs failed to demonstrate sufficient personal stake in the issue to establish standing. Three of those in the majority concluded that the plaintiffs' more serious standing problem was the lack of redressability, because the previously-required regulation (even if reinstated) would not have ensured the survival of the threatened species. Two dissenters concluded that plaintiffs had successfully demonstrated all the requirements to establish standing. *Id.*

In *Elk Grove Unified School District v. Newdow*, 542 U.S. 1, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004), Plaintiff, an atheist, complained about his daughter having to recite the Pledge of Allegiance each day in school because its text contains the phrase "under God." The Supreme Court concluded that he lacked proper Next Friend standing after his ex-wife filed a motion to intervene, stating that she had exclusive legal custody over the girl and that neither she nor the child had any objection to the Pledge. *Id.* at 15, 124 S.Ct. at 2311.

In *Valley Forge Christian College*, cited above, the Supreme Court, in a five-to-four decision, concluded that plaintiffs lacked standing to object to the federal government's transfer of land, previously a military installation, to a bible college. Plaintiffs claimed taxpayer standing, arguing that the Establishment Clause was violated when their taxes were expended in a way that would benefit the religious school. Following a line of cases which stand for the proposition that "the expenditure of public funds in an allegedly unconstitutional manner is not an injury sufficient to confer standing, even though the plaintiff contributes to the public coffers as a taxpayer," 454 U.S. at 477, 102 S.Ct. at 761, five justices concluded that plaintiffs lacked taxpayer standing, as well as any other grounds to object to the government's conduct, "other than the psychological consequence presumably produced by observation of conduct with which one disagrees." *Id.* at 485, 102 S.Ct. at 765. In response to plaintiffs' argument that they had a spiritual stake in First Amendment values, the Supreme Court, in a footnote, distinguished one of its several school prayer cases, reproaching plaintiffs for taking the "spiritual stake" language out of context:

First, the language cannot be read apart from the context of its accompanying reference to *Abington School District v. Schempp*. In *Schempp*, the Court invalidated laws that required Bible reading

in the public schools. Plaintiffs were children who attended the schools in question, and their parents. The [*Schempp* ] Court noted:

> "It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain.... The parties here are school children and their parents, who are directly affected by the laws and practices against which their complaints are directed. These interests surely suffice to give the parties standing to complain."

... The plaintiffs in *Schempp* had standing, not because their complaint rested on the Establishment Clause—for as *Doremus* [*v. Board of Education of Borough of Hawthorne*, 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952) ] demonstrated, that is insufficient—but because impressionable schoolchildren were subjected to unwelcome religious exercises or were forced to assume special burdens to avoid them. Respondents have alleged no comparable injury.

454 U.S. at 486 n. 22, 102 S.Ct. at 766 n. 22 (internal citations omitted).

In the many cases where the Supreme Court has addressed school prayer, or bible-reading as in *Abington School District v. Schempp* (distinguished by the *Valley Forge* Court, above), it has nearly always determined that the plaintiffs' standing was valid, either expressly, or implicitly by proceeding to the merits of the dispute with no discussion of standing. In none of these cases does the Court discuss the feelings or statements of the students involved or question whether or not the students were truly upset by the prayers.

In *Abington School District v. Schempp*, two families brought suits against their childrens' public school districts to challenge the practice of daily bible readings in school. 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). The *Schempp* Court jumped right into its Establishment Clause analysis, pausing only to mention in a footnote that "It goes without saying that the laws and practices involved here can be challenged only by persons having standing to complain." *Id.* at 224 fn. 9, 83 S.Ct. at 1572 fn. 9. The Court continues with the language previously quoted above in *Valley Forge* that the interests of the schoolchildren and their parents "surely suffice to give the parties standing" because they are "directly affected by the laws and practices against which their complaints are directed." *Id.*

In *Engel v. Vitale*, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), the parents of ten public school children sued their school district over the daily recitation of a prayer drafted by the New York State Board of Regents. Standing is not mentioned by the Court; it is assumed. In *Lee v. Weisman*, 505 U.S. 577, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992), a Rhode Island father brought suit objecting to the inclusion of prayer in a public school graduation ceremony. Weisman asserted taxpayer standing as well as Next Friend standing on behalf of his daughter. The Court wrote,

> We find it unnecessary to address Daniel Weisman's taxpayer standing, for a live and justiciable controversy is before us. Deborah Weisman is enrolled as a student at Classical High School in Providence and from the record it appears likely, if not certain, that an invocation and benediction will be conducted at her high school graduation.

*Id.* at 584, 112 S.Ct. at 2654.

■ This Court is satisfied that the Supreme Court, were it to analyze Plaintiff's standing herein, would determine that her status as a student enrolled at Cranston West is sufficient to confer standing in a dispute about a prayer displayed at her school. Like the student in *Lee v. Weisman*, she is a captive audience. Beyond

that, Plaintiff has stated that the presence of a Christian prayer on the wall of her school has made her feel ostracized and out of place. She has also stated that she doesn't find the text of the Prayer to be offensive. The Court fails to find these statements inconsistent. It is possible to object to the presence of the Prayer Mural without having to find its goals of academic achievement and good sportsmanship offensive. While her injuries might be characterized as abstract, those injuries are consistent with the injuries complained of by other plaintiffs in Establishment Clause litigation, such as *Engel v. Vitale* and the *Schempp* case, and readily distinguishable from the cases where the Supreme Court has determined that plaintiffs lacked standing, such as *Lujan, Valley Forge Christian College*, and *Elk Grove Unified School District v. Newdow*.

## II. *The Constitutionality of the Prayer Mural*

Having determined that Plaintiff has standing to bring her lawsuit, it remains for the Court to explain why her challenge prevails. The Establishment Clause of the First Amendment of the U.S. Constitution requires that "Congress shall make no law respecting an establishment of religion . . ." This mandate was extended to the states with the enactment of the Fourteenth Amendment. Though the words are simple, their application to the circumstances of our evolving nation has been complex and contentious. The guiding principle of Establishment Clause jurisprudence has been government neutrality. In *McCreary County v. ACLU*, the Supreme Court wrote:

> The touchstone for our analysis is the principle that the First Amendment

mandates governmental neutrality between religion and religion, and between religion and nonreligion. When the government acts with the ostensible and predominant purpose of advancing religion, it violates that central Establishment Clause value of official religious neutrality, there being no neutrality when the government's ostensible object is to take sides.

545 U.S. 844, 860, 125 S.Ct. 2722, 2733, 162 L.Ed.2d 729 (2005) (internal quotations and citations omitted).

Notwithstanding its commitment to neutrality, the Supreme Court has been divided about the outcomes of disputes,[4] as well as about the proper analytic tools used to arrive at those outcomes.[5] In *Lemon v. Kurtzman*, 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971), the Supreme Court set forth a three-part test for Establishment Clause cases; however, in subsequent cases the Court has at times criticized the *Lemon* test, describing its factors as "signposts," *Hunt v. McNair*, 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973), or "considerations," *McCreary County*, 545 U.S. at 859, 125 S.Ct. at 2732.

Fortunately, the First Circuit recently analyzed an Establishment Clause dispute, *Freedom From Religion Foundation v. Hanover School District*, 626 F.3d 1 (1st Cir.2010), and has provided a clear analytical framework for this Court to follow. In the *Freedom From Religion* case, which addressed the "under God" portion of the Pledge of Allegiance, the First Circuit explained the "three interrelated analytical approaches" articulated by the Supreme

---

4. *See Van Orden v. Perry*, 545 U.S. 677, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005), and *McCreary County*, both announced on the same day, with one upholding and one prohibiting displays of the Ten Commandments.

5. See Chief Justice Rehnquist's dismissal of the *Lemon* test in *Van Orden*, 545 U.S. at 686, 125 S.Ct. at 2861.

Court, including the three-prong *Lemon* "analysis," as well as:

> [t]he "endorsement" analysis, first articulated by Justice O'Connor in her concurrence in *Lynch v. Donnelly*, 465 U.S. 668, 688, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984), and applied by a majority of the Court in *County of Allegheny v. ACLU*, 492 U.S. 573, 109 S.Ct. 3086, 106 L.Ed.2d 472 (1989); and the "coercion" analysis of *Lee v. Weisman*, 505 U.S. 577, 587, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992).

626 F.3d at 7. In *Freedom From Religion*, the First Circuit proceeded to measure the circumstances before it against each one of these approaches. This Court will do the same.

### The Lemon test

■ According to the *Lemon v. Kurtzman* analysis, a governmental practice, or legislative act, must satisfy three tests in order to survive an Establishment Clause challenge. It must: "(1) reflect a clearly secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) it must avoid excessive government entanglement with religion." *Lee v. Weisman*, 505 U.S. 577, 585, 112 S.Ct. 2649, 2654.

■ To examine the secular-ness of Cranston West's Prayer Mural, one must reflect upon almost fifty years of history. The purposes of the Prayer, when drafted, and the Prayer Mural, when installed, were clearly religious in nature. David Bradley was assigned the task of authoring the School Prayer in 1959, prior to the Supreme Court's 1962 decision in *Engel v. Vitale* finding daily prayer recitations in public school constitutionally impermissible. Soon after, Cranston West ended the recitation of prayer, but the School Prayer was memorialized in the form of the Prayer Mural.

No amount of debate can make the School Prayer anything other than a prayer, and a Christian one at that. Its opening, calling upon the "Heavenly Father," is an exclusively Christian formulation of a monotheistic deity, leaving out, *inter alia*, Jews, Muslims, Hindus, Buddhists, and atheists alike. The Prayer concludes with the indisputably religious closing: "Amen;" a Hebrew word used by Jews, Christians and Muslims to conclude prayers. In between, the Prayer espouses values of honesty, kindness, friendship and sportsmanship. While these goals are commendable, the reliance on God's intervention as the way to achieve those goals is not consistent with a secular purpose. Nonetheless, the Prayer Mural has hung on the auditorium wall for the last forty-six-odd years, all the while taking on the mantel of history and tradition.

To determine the present purpose of the Prayer Mural, it is necessary to examine the School Committee's motivations and its March 2011 vote to defend the Mural. While the tenor of the School Committee's open meeting at times resembled a religious revival, the reasons articulated by the four School Committee members who voted to keep the Prayer Mural up, even in the face of anticipated litigation, were nuanced and varied. Two Committee members were clearly motivated by their adherence to strong Catholic religious beliefs. Other reasons cited for keeping the Prayer Mural included the importance of conveying moral values to high school students; the importance of history and tradition to Cranston West; the importance of respecting each student's contribution to the school; and the importance to these elected officials of responding to their constituency. The Court refrains from second-guessing the expressed motives of the Committee members, but nonetheless must point out that tradition is a murky and dangerous bog. While all agree that

some traditions should be honored, others must be put to rest as our national values and notions of tolerance and diversity evolve. At any rate, no amount of history and tradition can cure a constitutional infraction. The Court concludes that Cranston's purposes in installing and, more recently, voting to retain the Prayer Mural are not clearly secular. Other less ambiguous constitutional problems with the Prayer Mural reveal themselves through the analysis of *Lemon's* other prongs.

■ *Lemon's* second prong prohibits government action that has a primary effect of advancing or hindering religion. To the extent the installation, 46–year–long maintenance and March 2011 endorsement of the Prayer Mural has an effect, its impact is to advance religion. The Prayer Mural espouses important moral values, yet it does so in the context of religious supplication. The retention of the Prayer Mural is no doubt a nod to Cranston West's tradition and history, yet that nod reflects the nostalgia felt by some members of the community who remember fondly when the community was sufficiently homogeneous that the religion of its majority could be practiced in public schools with impunity.

■ The third prong of *Lemon* requires that the government action "avoid excessive entanglement with religion." *Weisman*, 505 U.S. at 585, 112 S.Ct. at 2654. It is on this prong that Cranston West's Prayer Mural reveals its most troubling aspect. The Cranston School Committee and its subcommittee held four open meetings to consider the fate of the Mural. At those meetings a significantly lopsided majority of the speakers spoke passionately, and in religious terms, in favor of retaining the Prayer Mural. Various speakers read from the bible, spoke about their personal religious convictions, threatened Plaintiff with damnation on Judgment Day and suggested that she will go to hell.

The atmosphere was such that the Superintendent of Schools felt compelled to discuss his own religious beliefs at length when he made his recommendation to the Committee that they vote to retain the Prayer Mural. Similarly, five of the seven School Committee members expressed avowals of their own religious beliefs at the meeting, including two of those who voted against retaining the Mural. This is precisely the sort of "civic divisiveness," *McCreary County*, 545 U.S. at 876, 125 S.Ct. at 2742, that the Supreme Court's Establishment Clause cases repeatedly warn against. For example, the *Engel* Court wrote:

> By the time of the adoption of the Constitution, our history shows that there was widespread awareness among many Americans of the dangers of a union of Church and State. These people knew, some of them from bitter personal experience, that one of the greatest dangers to the freedom of the individual to worship in his own way lay in the Government's placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services.... The Constitution was intended to avert a part of this danger by leaving the government of this country in the hands of the people rather than in the hands of any monarch. But this safeguard was not enough. Our Founders were no more willing to let the content of their prayers and their privilege of praying whenever they pleased be influenced by the ballot box than they were to let these vital matters of personal conscience depend upon the succession of monarchs.

370 U.S. at 429, 82 S.Ct. at 1266. *See also Lemon*, 403 U.S. at 622, 91 S.Ct. at 2116 (... "political divisions along religious

lines was one of the principal evils against which the First Amendment was intended to protect.") When focused on the Prayer Mural, the activities and agenda of the Cranston School Committee became excessively entangled with religion, exposing the Committee to a situation where a loud and passionate majority encouraged it to vote to override the constitutional rights of a minority.

### The endorsement test

 Pursuant to the endorsement analysis, the Court must determine if the actions of the Cranston School Committee have the "purpose or effect of endorsing, favoring, or promoting religion." *Freedom From Religion Foundation*, 626 F.3d at 10. The Government must not appear to take sides on issues of religious beliefs. In *Santa Fe Independent School District v. Doe*, a case involving prayer at public high school football games, the Supreme Court wrote:

> School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherents "that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community."

530 U.S. 290, 309–10, 120 S.Ct. 2266, 2279, 147 L.Ed.2d 295 (2000) (quoting *Lynch v. Donnelly*, 465 U.S. 668, 688, 104 S.Ct. 1355, 1367, 79 L.Ed.2d 604 (1984)).

 It is incontestable that at the end of the lengthy School Committee meeting on March 7, 2011, those in support of the Prayer Mural believed that they had won the day, and that Plaintiff and her few friends were the losers. A similar message was conveyed to Plaintiff when Mayor Fung told the students assembled at Cranston West for Diversity Day that the Prayer Mural should stay. While Plaintiff recalls feeling ostracized and alone, the constitutionality of the Prayer Mural turns not on Plaintiff's feelings, but rather on the Court's assessment of how a reasonable and objective observer, fully aware of the background and circumstances, would view the Prayer Mural and the conduct of the School Committee. *Freedom From Religion Foundation*, 626 F.3d at 11.

Again, to perform this analysis, the Court must examine the Prayer Mural at three points in time. When the Prayer Mural was hung in 1963, a reasonable observer would no doubt have concluded that Cranston West endorsed its message, and approved its installation in a place of prominence in the new auditorium. While the Prayer was authored by a student, and the Mural was paid for by a group of graduates, the School would never have permitted the exhibition of a message of which it did not approve. During the forty-five-plus years that the Prayer Mural has hung in the auditorium, an observer would probably have been puzzled by the Prayer Mural. Clearly it is "old-looking" as Committee member Lombardi observed, and yet it is still maintained and located in a place of honor to the right of the stage, next to the clock. However, if that puzzled observer had sat in on the March 7, 2011, School Committee meeting, his or her confusion would have ended. At that meeting, the School Committee endorsed the position of those who believe that it is acceptable to use Christian prayer to instill values in public schoolchildren; a decision that clearly placed the 'nonadherents' outside of the political community.

### The coercion analysis

 The final test employed by the First Circuit in the *Freedom From Religion* case is referred to as the "coercion analysis." In *Lee v. Weisman*, the Supreme Court refrained from relying on *Lemon*, because, as the Court wrote, the

government's involvement with religious activity was so pervasive that the analysis was unnecessary. 505 U.S. at 587, 112 S.Ct. at 2655. A Rhode Island case, *Weisman* involved the inclusion of prayer at the graduation ceremony at Classical High School in Providence. Although it was possible for a student to graduate without attending the ceremony, and it was possible to attend the ceremony without participating in the prayer, the Court found that there was "subtle coercive pressure" to participate, particularly in the setting of a school activity.

> What to most believers may seem nothing more than a reasonable request that the nonbeliever respect their religious practices, in a school context may appear to the nonbeliever or dissenter to be an attempt to employ the machinery of the State to enforce a religious orthodoxy.

*Id.* at 592, 112 S.Ct. at 2658. Both the *Freedom From Religion* case and *Weisman* involve public schoolchildren, where the Supreme Court has always demonstrated a heightened sensitivity to any perceived coercive pressure. *See Schempp,* 374 U.S. at 230, 83 S.Ct. at 1576 (... "constitutional prohibitions encounter their severest test when they are sought to be applied in the classroom.") Applying the coercion analysis to the present dispute, the Court determines that any coercive pressure exerted by the sight of the Prayer Mural on the wall would have been subtle indeed. Nonetheless, the high school setting in the present case does invoke the highest scrutiny employed by the Supreme Court in Establishment Clause cases.

### Public schools

The Supreme Court has traditionally drawn a clear line between government conduct which might be acceptable in some settings and the conduct which is prohibited in public schools. In *Van Orden,* where the Supreme Court held that a monument displaying the Ten Commandments was acceptable on the 44–acre grounds of the Texas State Capitol, the Court underscored this distinction:

> This case, moreover, is distinguishable from instances where the Court has found Ten Commandments displays impermissible. The display is not on the grounds of a public school, where, given the impressionability of the young, government must exercise particular care in separating church and state.

545 U.S. at 703, 125 S.Ct. at 2871. The Court elaborated on its concerns in *Weisman,* explaining the impact on high school students that can be exerted through peer pressure, public pressure and the effect of the opinions of respected teachers and administrators. 505 U.S. at 593, 112 S.Ct. at 2658. In *Edwards v. Aguillard,* which struck down Louisiana's creation science curriculum, the Supreme Court wrote:

> The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary.

482 U.S. 578, 583–84, 107 S.Ct. 2573, 2577, 96 L.Ed.2d 510 (1987).

The Supreme Court case with facts most directly on all fours with the Cranston dispute is *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980). In that case, plaintiffs challenged a Kentucky statute that required schools to post copies of the Ten Commandments on the wall of every public school classroom. The stat-

ute specified that the copies would be purchased with private donations. *Id.* at 41, 101 S.Ct. at 193. The school district defended the statute, arguing that the purposes of the statute were "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." *Id.* at 41, 101 S.Ct. at 194. Employing the *Lemon* test, the *Stone* Court concluded that the primary purpose of posting the Ten Commandments was "plainly religious," and "no legislative recitation of a supposed secular purpose can blind us to that fact." *Id.* at 41, 101 S.Ct. at 194. The *Stone* Court also concluded that no educational purpose would be attained with the posted text:

> If the posted copies of the Ten Commandments are to have any effect at all, it will be to induce the schoolchildren to read, meditate upon, perhaps to venerate and obey, the Commandments. However desirable this might be as a matter of private devotion, it is not a permissible state objective under the Establishment Clause.

*Id.* at 42, 101 S.Ct. at 194. The holding in *Stone v. Graham* compels this Court's ruling herein.

### *"There goes many a ship to sea . . . "*

█ It remains for this Court to attempt to soothe those who may believe that this decision represents a harsh result over a minor Constitutional infraction. The Supreme Court offers two pertinent lessons. First, the Supreme Court urges us to remember that "insistence upon neutrality, vital as it surely is for untrammeled religious liberty, may appear to border upon religious hostility. But in the long view the independence of both church and state in their respective spheres will be better served by close adherence to the neutrality principle." *Schempp,* 374 U.S. at 246, 83 S.Ct. at 1584. Second, later in the same opinion, the Supreme Court addresses the circumstance in *Engel,* where, as here, the complaints of a few overcame the beliefs and desires of the majority: "Nor did it matter that few children had complained of the practice, for the measure of the seriousness of a breach of the Establishment Clause has never been thought to be the number of people who complain of it." *Id.* at 264, 83 S.Ct. at 1594. Plaintiff is clearly an articulate and courageous young woman, who took a brave stand, particularly in light of the hostile response she has received from her community.

Over the many years of its history, the Supreme Court has turned to the words of the Founding Fathers and the framers of the Constitution to support varying interpretations of the Establishment Clause. Many chapters have been devoted to Thomas Jefferson, James Madison, George Washington and even Abraham Lincoln, and what their expectations were for the public religious practices of this nation. This Court has tried to resist the temptation of injecting lofty rhetoric into this opinion, but nonetheless was moved by the words, as quoted in *Schempp,* of Roger Williams, the founder of our state, who left the Massachusetts Bay Colony in pursuit of religious liberty.

> There goes many a ship to sea, with many hundred souls in one ship, whose weal and woe is common, and is a true picture of a commonwealth, or human combination, or society. It hath fallen out sometimes, that both Papists and Protestants, Jews and Turks, may be embarked on one ship; upon which supposal, I affirm that all the liberty of conscience I ever pleaded for, turns upon these two hinges, that none of the Papists, Protestants, Jews, or Turks be forced to come to the ship's prayers or worship, nor compelled from their own

particular prayers or worship, if they practice any.

*Id.* at 214 n. 6, 83 S.Ct. at 1567 n. 6.

### Conclusion

■ For all these reasons, this Court grants Plaintiff's motion for a mandatory permanent injunction, and orders the immediate removal of the School Prayer mural from Cranston High School West. The Plaintiff, as the prevailing party, is given twenty days from the date hereof to file for counsel fees and costs. Defendants shall have ten days after Plaintiff's filing to respond. This Court will enter judgment after these issues are resolved. It is so ordered.

### MEMORANDUM AND ORDER

This matter is again before the Court on various motions filed by Michael Motaranni, Christian Frangos, Olivia Frangos, Carolyn Mesagno, Lori McClain, Jared McMullen and Ronald L'Heureux (hereinafter identified collectively as "Movants"). These individuals seek to change the outcome of the Court's earlier decision in this matter, entered on January 11, 2012, granting Plaintiff's Motion for a Permanent Injunction, and ordering the immediate removal of the Christian prayer mural from the walls of the auditorium of the public high school, called Cranston West, located in Cranston, Rhode Island. 840 F.Supp.2d 507 (D.R.I.2012).[1]

After this Court's Order was entered, Cranston initially covered the mural with plywood, as was stipulated by the parties on February 8, 2012. This writer read in *The Providence Journal,* on February 17, 2012, that the Cranston School Committee had voted the previous evening to abide by this Court's decision, rather than pursue an appeal. On March 5, 2012, the parties filed an additional stipulation with this Court. This stipulation provided Defen-

dants with additional time to file objections limited to the subject of attorneys' fees, "[I]n light of the fact and on condition that the School Prayer Mural has been permanently removed from Cranston High School West." The parties ironed out their differences over fees and this Court signed the final judgment on March 7, 2012.

When Movants filed their motions on March 7, 2012, this matter was already "a done deal." Nonetheless, the Court will briefly address the various motions. The main motions are (1) a Motion to Intervene in this closed case, (2) a Motion to Stay the Decision and Order, and finally (3) a Motion for Reconsideration. A single lengthy memorandum was filed in support of all three motions. In order to file a Motion to Stay or a Motion for Reconsideration, it is necessary for Movants to first intervene in the litigation in a procedurally proper way and become parties in this case. In order to intervene, Movants must comply with Rule 24 of the Federal Rules of Civil Procedure; specifically, part (b), which provides for permissive intervention as follows:

**(b) Permissive Intervention.**

(1) *In General.* On *timely* motion, the court *may* permit anyone to intervene who:

(A) is given a conditional right to intervene by a federal statute; or

(B) has a claim or defense that shares with the main action a common question of law or fact.

(Emphasis added).

■ Courts generally look with disfavor on motions to intervene that are filed after the entry of final judgment. *Garrity v. Gallen,* 697 F.2d 452, 455 n. 6 (1st Cir.1983). The *Garrity* Court wrote:

---

1. 2012 WL 89965, D.R.I., January 11, 2012.

The timeliness requirement was not designed to penalize prospective intervenors for failing to act promptly; rather, it insures that existing parties to the litigation are not prejudiced by the failure of would-be intervenors to act in a timely fashion.

*Id.* at 455. Moreover, the "determination of the timeliness is within the sound discretion of the district court." *Id.* at 455.

 The Court recognizes that Movants filed their motions on the same day that the final judgment was signed. Nevertheless, the Court determines that the Motion to Intervene is not timely. The matter of the prayer mural was covered extensively by the news media. Moreover, it seems apparent to the Court that at least some of the would-be intervenors attended some or all of the many public hearings held by the Cranston School Committee in connection with this issue. By mid-January, when the Court issued its Decision and Order, Movants knew that the Court's ruling had not gone as they had hoped. Over a month went by before the School Committee was able to convene, listen to extensive public testimony and ultimately vote not to appeal the ruling. After that, Defendants made arrangements and carried out the permanent removal of the banner. Additional time was spent haggling over attorneys' fees. Two and half weeks after the School Committee's vote, final judgment was entered, bringing this drawn-out affair to a conclusion, after almost two years of divisive community debate. In short, this Court holds that Movants' Motion to Intervene, under the circumstances, is not timely. In addition, Movants have made no showing that they have standing in this matter. It is time to move on.

The denial of Movants' motion to intervene renders all of their other motions moot. However, the Court will also briefly address Movants' memorandum of law which sets forth a mishmash of misguided and frivolous arguments. They assert that compelling and dispositive arguments were presented to the Cranston School Committee at the public hearings that were not included in Defendants' briefs to this Court. Movants believe that these arguments, if considered by this Court, would have resulted in a different ruling. They are wrong. As Alexander Pope, an English poet and essayist, once wrote, "A little learning is a dangerous thing."

In essence, Movants argue that, not just this Court's January 2012 ruling, but virtually all Supreme Court rulings on the Establishment Clause dating back to the Supreme Court's decision in *Everson v. Board of Ed. of Ewing Township*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), have been wrongly decided in contravention of the United States Constitution, and other controlling laws. In particular Movants cite "the Aitken act of 1872 authorizing the use of bibles in all schools in America." The Aitken Bible was the first bible printed in English in the United States, in 1782, during the Revolutionary War, when England's embargo prevented the importation of bibles to the colonies. Prior to publication, Aitken sought and received authorization from the Continental Congress, which approved the publication on September 10, 1782. Congress' resolution was included in the Aitken Bible, and reads:

RESOLVED,

THAT the United States in Congress assembled highly approve the pious and laudable undertaking of Mr. Aitken, as subservient to the interest of religion, as well as an instance of the progress of arts in this country, and being satisfied from the above report of his care and accuracy in the execution of the work, they recommend this edition of the Bible to the inhabitants of the United States, and hereby authorize him to publish this

Recommendation in the manner he shall think proper.

CHA. THOMSON, Sec'ry.[2]

Beyond the putative mandates of the Aitken Act, Movants also cite the United States Constitution, the Rhode Island Constitution, and an assortment of excerpted quotations of the Founding Fathers and various historians concerning the role of Christianity in our country. Interspersed in this catalog of historical writings is Movants' argument:

> That the federal court's sixty-six years of systematically removing Christianity from all public places in contravention of the Aitken Act of Congress and the true meaning of the First Amendment, to protect our Godly Foundation clearly found in the writings of the founders and even court decisions defining religion hereinafter, establishes Atheism and/or "non religion" as the religion of choice, may constitute judicial legislation, and violating separation of powers, the establishment and free exercise clause of the First Amendment inter alia.

■ The Court characterizes this argument as frivolous because Movants concede as part of their argument that this Court's decision is in line with a half-century of Supreme Court precedent. This Court is not merely guided, but is bound, by Supreme Court precedent. The obligation to follow precedent, known as the doctrine of *stare decisis,* is a bedrock of the rule of law on which the stability of our nation is based. The First Circuit has stated:

The doctrine of stare decisis provides that courts must abide by or adhere to cases that have been previously decided and that a legal decision on an issue of law that is contained in a final judgment is binding in all future cases on the court that made the legal decision and all other courts that owe obedience to that court. In other words, the doctrine of stare decisis incorporates two principles: (1) a court is bound by its own prior legal decisions unless there are substantial reasons to abandon a decision; and (2) a legal decision rendered by a court will be followed by all courts inferior to it in the judicial system.

*U.S. v. Rodriguez–Pacheco,* 475 F.3d 434 (1st Cir.2007) (*quoting* 3 J. Moore et al., *Moore's Manual–Federal Practice and Procedure* § 30.10[1] (2006)), *see also Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ("*Stare decisis* is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process.").

For this Court in this case, the clear dictates of Supreme Court precedent go back to *Engel v. Vitale,* 370 U.S. 421, 430, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), which prohibited the recitation of prayer in public schools, writing that, "[N]either the fact that the prayer may be denominationally neutral nor the fact that its observance on the part of the students is voluntary can serve to free it from the limitations of the

---

**2.** The Court reprints this resolution from a photographic facsimile page of the Aitken Bible, found at www.wallbuilders.com, a website "dedicated to presenting American's forgotten history and heroes, with an emphasis on the moral, religious, and constitutional foundation on which America was built." Wallbuilders also published a small book, titled "The New England Primer," dated 1777, which movant Ronald L'Heureux sent to this Court in December 2011. The book contains Christian teachings. The Constitution became effective in 1789, with the ten Amendments comprising the Bill of Rights being ratified in 1791. Religious practices followed in public schools before that time are irrelevant to the present dispute.

Establishment Clause ..." The Supreme Court continued:

> When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.

370 U.S. at 431, 82 S.Ct. 1261. The guidance provided by the Supreme Court in *Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), is equally unequivocal. In that case, the Supreme Court held that it was impermissible for Kentucky public schools to post copies of the Ten Commandments in classrooms. For further analysis and explanation, the Court refers the reader to its earlier decision in this matter. Suffice it to say that the Supreme Court precedents on school prayer are clear, and this Court is bound to adhere to that law.

### *Conclusion*

For the reasons stated above, the motions filed by Michael Motaranni, Christian Frangos, Olivia Frangos, Carolyn Mesagno, Lori McClain, Jared McMullen and Ronald L'Heureux are hereby denied. This case is over. Anyone who hereafter tries to revive this matter risks the imposition of sanctions under Fed.R.Civ.P. 11. It is so ordered.