*681 Chief Justice Rehnquist
announced the judgment of
the Court and delivered an opinion,
in which Justice Scalia, Justice Kennedy, and Justice Thomas join.
The question here is whether the Establishment Clause of the First Amendment allows the display of a monument inscribed with the Ten Commandments on the Texas State Capitol grounds. We hold that it does.
The 22 acres surrounding the Texas State Capitol contain 17 monuments and 21 historical markers commemorating the “people, ideals, and events that compose Texan identity.” Tex. H. Con. Res. 38, 77th Leg., Reg. Sess. (2001).[1] The monolith challenged here stands 6-feet high and 3-feet wide. It is located to the north of the Capitol building, between the Capitol and the Supreme Court building. Its primary content is the text of the Ten Commandments. An eagle grasping the American flag, an eye inside of a pyramid, and two small tablets with what appears to be an ancient script are carved above the text of the Ten Commandments. Below the text are two Stars of David and the superimposed Greek letters Chi and Rho, which represent Christ. The bottom of the monument bears the inscription “PRE *682 SENTED TO THE PEOPLE AND YOUTH OF TEXAS BY THE FRATERNAL ORDER OF EAGLES OF TEXAS 1961.” App. to Pet. for Cert. 21.
The legislative record surrounding the State’s acceptance of the monument from the Eagles — a national social, civic, and patriotic organization — is limited to legislative journal entries. After the monument was accepted, the State selected a site for the monument based on the recommendation of the state organization responsible for maintaining the Capitol grounds. The Eagles paid the cost of erecting the monument, the dedication of which was presided over by two state legislators.
Petitioner Thomas Van Orden is a native Texan and a resident of Austin. At one time he was a licensed lawyer, having graduated from Southern Methodist Law School. Van Orden testified that, since 1995, he has encountered the Ten Commandments monument during his frequent visits to the Capitol grounds. His visits are typically for the purpose of using the law library in the Supreme Court building, which is located just northwest of the Capitol building.
Forty years after the monument’s erection and six years after Van Orden began to encounter the monument frequently, he sued numerous state officials in their official capacities under Rev. Stat. § 1979, 42 U. S. C. § 1983, seeking both a declaration that the monument’s placement violates the Establishment Clause and an injunction requiring its removal. After a bench trial, the District Court held that the monument did not contravene the Establishment Clause. It found that the State had a valid secular purpose in recognizing and commending the Eagles for their efforts to reduce juvenile delinquency. The District Court also determined that a reasonable observer, mindful of the history, purpose, and context, would not conclude that this passive monument conveyed the message that the State was seeking to endorse religion. The Court of Appeals affirmed the District *683 Court’s holdings with respect to the monument’s purpose and effect. 351 F. 3d 173 (CA5 2003). We granted certiorari, 543 U. S. 923 (2004), and now affirm.
Our cases, Januslike, point in two directions in applying the Establishment Clause. One face looks toward the strong role played by religion and religious traditions throughout our Nation’s history. As we observed in School Dist. of Abington Township v. Schempp, 374 U. S. 203 (1963):
"It is true that religion has been closely identified with our history and government.. . . The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself.... It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are ‘earnestly praying, as ... in duty bound, that the Supreme Lawgiver of the Universe .. . guide them into every measure which may be worthy of his [blessing ....]’ ” Id., at 212-213.[2]
The other face looks toward the principle that governmental intervention in religious matters can itself endanger religious freedom.
This case, like all Establishment Clause challenges, presents us with the difficulty of respecting both faces. Our institutions presuppose a Supreme Being, yet these institutions must not press religious observances upon their citizens. One face looks to the past in acknowledgment of our Nation’s heritage, while the other looks to the present in demanding a separation between church and state. Reconciling these two faces requires that we neither abdicate our *684 responsibility to maintain a division between church and state nor evince a hostility to religion by disabling the government from in some ways recognizing our religious heritage:
“When the state encourages religious instruction or cooperates with religious authorities by adjusting the schedule of public events to sectarian needs, it follows the best of our traditions. For it then respects the religious nature of our people and accommodates the public service to their spiritual needs. To hold that it may not would be to find in the Constitution a requirement that the government show a callous indifference to religious groups. . . . [W]e find no constitutional requirement which makes it necessary for government to be hostile to religion and to throw its weight against efforts to widen the effective scope of religious influence.” Zorach v. Clauson, 343 U. S. 306, 313-314 (1952).
See also Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819, 845-846 (1995) (warning against the “risk [of] fostering a pervasive bias or hostility to religion, which could undermine the very neutrality the Establishment Clause requires”).[3]
*685 These two faces are evident in representative cases both upholding[4] and invalidating[5] laws under the Establishment Clause. Over the last 25 years, we have sometimes pointed *686 to Lemon v. Kurtzman, 403 U. S. 602 (1971), as providing the governing test in Establishment Clause challenges.[6] Compare Wallace v. Jaffree, 472 U. S. 38 (1985) (applying Lemon), with Marsh v. Chambers, 463 U. S. 783 (1983) (not applying Lemon). Yet, just two years after Lemon was decided, we noted that the factors identified in Lemon serve as “no more than helpful signposts.” Hunt v. McNair, 413 U. S. 734, 741 (1973). Many of our recent cases simply have not applied the Lemon test. See, e. g., Zelman v. Simmons-Harris, 536 U. S. 639 (2002); Good News Club v. Milford Central School, 533 U. S. 98 (2001). Others have applied it only after concluding that the challenged practice was invalid under a different Establishment Clause test.
Whatever may be the fate of the Lemon test in the larger scheme of Establishment Clause jurisprudence, we think it not useful in dealing with the sort of passive monument that Texas has erected on its Capitol grounds. Instead, our analysis is driven both by the nature of the monument and by our Nation’s history.
As we explained in Lynch v. Donnelly, 465 U. S. 668 (1984): “There is an unbroken history of official acknowledgment by all three branches of government of the role of religion in American life from at least 1789.” Id., at 674. For example, both Houses passed resolutions in 1789 asking President George Washington to issue a Thanksgiving Day Proclamation to “recommend to the people of the United States a day of public thanksgiving and prayer, to be observed, by acknowledging, with grateful hearts, the many and signal favors of Almighty God.” 1 Annals of Cong. 90, 914 (internal quotation marks omitted). President Washington’s procla *687 mation directly attributed to the Supreme Being the foundations and successes of our young Nation:
“Now, therefore, I do recommend and assign Thursday, the 26th day of November next, to be devoted by the people of these States to the service of that great and glorious Being who is the beneficent author of all the good that was, that is, or that will be; that we may then all unite in rendering unto Him our sincere and humble thanks for His kind care and protection of the people of this country previous to their becoming a nation; for the signal and manifold mercies and the favorable interpositions of His providence in the course and conclusion of the late war; for the great degree of tran-quillity, union, and plenty which we have since enjoyed; for the peaceable and rational manner in which we have been enabled to establish constitutions of government for our safety and happiness, and particularly the national one now lately instituted; for the civil and religious liberty with which we are blessed, and the means we have of acquiring and diffusing useful knowledge; and, in general, for all the great and various favors which He has been pleased to confer upon us.” 1 J. Richardson, Messages and Papers of the Presidents, 1789-1897, p. 64 (1899).
Recognition of the role of God in our Nation’s heritage has also been reflected in our decisions. We have acknowledged, for example, that “religion has been closely identified with our history and government,” School Dist. of Abington Township v. Schempp, 374 U. S., at 212, and that “[t]he history of man is inseparable from the history of religion,” Engel v. Vitale, 370 U. S. 421, 434 (1962).[7] This recognition *688 has led us to hold that the Establishment Clause permits a state legislature to open its daily sessions with a prayer by a chaplain paid by the State. Marsh v. Chambers, 463 U. S., at 792.[8] Such a practice, we thought, was “deeply embedded in the history and tradition of this country.” Id., at 786. As we observed there, “it would be incongruous to interpret [the Establishment Clause] as imposing more stringent First Amendment limits on the states than the draftsmen imposed on the Federal Government.” Id., at 790-791. With similar reasoning, we have upheld laws, which originated from one of the Ten Commandments, that prohibited the sale of merchandise on Sunday. McGowan v. Maryland, 366 U. S. 420, 431-440 (1961); see id., at 470-488 (separate opinion of Frankfurter, J.).
In this case we are faced with a display of the Ten Commandments on government property outside the Texas State Capitol. Such acknowledgments of the role played by the Ten Commandments in our Nation’s heritage are common throughout America. We need only look within our own Courtroom. Since 1935, Moses has stood, holding two tablets that reveal portions of the Ten Commandments written in Hebrew, among other lawgivers in the south frieze. Representations of the Ten Commandments adorn the metal gates lining the north and south sides of the Courtroom as well as the doors leading into the Courtroom. Moses also sits on the exterior east facade of the building holding the Ten Commandments tablets.
*689 Similar acknowledgments can be seen throughout a visitor’s tour of our Nation’s Capital. For example, a large statue of Moses holding the Ten Commandments, alongside a statue of the Apostle Paul, has overlooked the rotunda of the Library of Congress’ Jefferson Building since 1897. And the Jefferson Building’s Great Reading Room contains a sculpture of a woman beside the Ten Commandments with a quote above her from the Old Testament (Micah 6:8). A medallion with two tablets depicting the Ten Commandments decorates the floor of the National Archives. Inside the Department of Justice, a statue entitled “The Spirit of Law” has two tablets representing the Ten Commandments lying at its feet. In front of the Ronald Reagan Building is another sculpture that includes a depiction of the Ten Commandments. So too a 24-foot-tall sculpture, depicting, among other things, the Ten Commandments and a cross, stands outside the federal courthouse that houses both the Court of Appeals and the District Court for the District of Columbia. Moses is also prominently featured in the Chamber of the United States House of Representatives.[9]
Our opinions, like our building, have recognized the role the Decalogue plays in America’s heritage. See, e. g., McGowan v. Maryland, 366 U. S., at 442; id., at 462 (separate opin *690 ion of Frankfurter, J.).[10] The Executive and Legislative Branches have also acknowledged the historical role of the Ten Commandments. See, e. g., Public Papers of the Presidents, Harry S. Truman, 1950, p. 157 (1965); S. Con. Res. 13, 105th Cong., 1st Sess. (1997); H. Con. Res. 31, 105th Cong., 1st Sess. (1997). These displays and recognitions of the Ten Commandments bespeak the rich American tradition of religious acknowledgments.
Of course, the Ten Commandments are religious — they were so viewed at their inception and so remain. The monument, therefore, has religious significance. According to Judeo-Christian belief, the Ten Commandments were given to Moses by God on Mt. Sinai. But Moses was a lawgiver as well as a religious leader. And the Ten Commandments have an undeniable historical meaning, as the foregoing examples demonstrate. Simply having religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause. See Lynch v. Donnelly, 465 U. S., at 680, 687; Marsh v. Chambers, 463 U. S., at 792; McGowan v. Maryland, supra, at 437-440; Walz v. Tax Comm’n of City of New York, 397 U. S. 664, 676-678 (1970).
There are, of course, limits to the display of religious messages or symbols. For example, we held unconstitutional a Kentucky statute requiring the posting of the Ten Commandments in every public schoolroom. Stone v. Graham, 449 U. S. 39 (1980) (per curiam). In the classroom context, we found that the Kentucky statute had an improper and plainly religious purpose. Id., at 41. As evidenced by Stone’s almost exclusive reliance upon two of our school *691 prayer cases, id., at 41-42 (citing School Dist. of Abington Township v. Schempp, 374 U. S. 203 (1963), and Engel v. Vitale, 370 U. S. 421 (1962)), it stands as an example of the fact that we have “been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools,” Edwards v. Aguillard, 482 U. S. 578, 583-584 (1987). Compare Lee v. Weisman, 505 U. S. 577, 596-597 (1992) (holding unconstitutional a prayer at a secondary school graduation), with Marsh v. Chambers, supra (upholding a prayer in the state legislature). Indeed, Edwards v. Aguillard recognized that Stone — along with Schempp and Engel — was a consequence of the “particular concerns that arise in the context of public elementary and secondary schools.” 482 U. S., at 584-585. Neither Stone itself nor subsequent opinions have indicated that Stone’s holding would extend to a legislative chamber, see Marsh v. Chambers, supra, or to capitol grounds.[11]
The placement of the Ten Commandments monument on the Texas State Capitol grounds is a far more passive use of those texts than was the case in Stone, where the text confronted elementary school students every day. Indeed, Van Orden, the petitioner here, apparently walked by the monument for a number of years before bringing this lawsuit. The monument is therefore also quite different from the prayers involved in Schempp and Lee v. Weisman. Texas has treated its Capitol grounds monuments as representing the several strands in the State’s political and legal history. The inclusion of the Ten Commandments monument in this *692 group has a dual significance, partaking of both religion and government. We cannot say that Texas’ display of this monument violates the Establishment Clause of the First Amendment.
The judgment of the Court of Appeals is affirmed.

It is so ordered.

 The monuments are: Heroes of the Alamo, Hood’s Brigade, Confederate Soldiers, Volunteer Fireman, Terry’s Texas Rangers, Texas Cowboy, Spanish-American War, Texas National Guard, Ten Commandments, Tribute to Texas School Children, Texas Pioneer Woman, The Boy Scouts’ Statue of Liberty Replica, Pearl Harbor Veterans, Korean War Veterans, Soldiers of World War I, Disabled Veterans, and Texas Peace Officers.

 See also Engel v. Vitale, 370 U. S. 421, 434 (1962) (“The history of man is inseparable from the history of religion”); Zorach v. Clauson, 343 U. S. 306, 313 (1952) (“We are a religious people whose institutions presuppose a Supreme Being”).

 Despite Justice Stevens’ recitation of occasional language to the contrary, post, at 710-711, and n. 7 (dissenting opinion), we have not, and do not, adhere to the principle that the Establishment Clause bars any and all governmental preference for religion over irreligión. See, e. g., Cutter v. Wilkinson, 544 U. S. 709 (2005); Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos, 483 U. S. 327 (1987); Lynch v. Donnelly, 465 U. S. 668 (1984); Marsh v. Chambers, 463 U. S. 783 (1983); Walz v. Tax Comm’n of City of New York, 397 U. S. 664 (1970). Even the dissenters do not claim that the First Amendment’s Religion Clauses forbid all governmental acknowledgments, preferences, or accommodations of religion. See post, at 711 (opinion of Stevens, J.) (recognizing that the Establishment Clause permits some “recognition” or “acknowledgment” of religion); post, at 740-741, and n. 4 (opinion of Souter, J.) (discussing a number of permissible displays with religious content).

 Zelman v. Simmons-Harris, 536 U. S. 639 (2002) (upholding school voucher program); Good News Club v. Milford Central School, 533 U. S. 98 (2001) (holding that allowing religious school groups to use school facilities does not violate the Establishment Clause); Agostini v. Felton, 521 U. S. 203 (1997) (approving a program that provided public employees to teach remedial classes at religious and other private schools), overruling Aguilar v. Felton, 473 U. S. 402 (1985) (barring public school teachers from going to parochial schools to provide remedial education to disadvantaged children), and School Dist. of Grand Rapids v. Ball, 473 U. S. 373 (1985) (striking down a program that provided classes to religious school students at public expense in classrooms leased from religious schools); Rosenberger v. Rector and Visitors of Univ. of Va., 515 U. S. 819 (1995) (holding that the Establishment Clause does not bar disbursement of funds from student activity fees to religious organizations); Zobrest v. Catalina Foothills School Dist., 509 U. S. 1 (1993) (allowing a public school district to provide a sign-language interpreter to a deaf student at a Catholic high school as part of a federal program for the disabled); Lynch v. Donnelly, supra (upholding a Christmas display including a créche); Marsh v. Chambers, supra (upholding legislative prayer); Mueller v. Allen, 463 U. S. 388 (1983) (upholding tax deduction for certain expenses incurred in sending one’s child to a religious school).

 Santa Fe Independent School Dist. v. Doe, 530 U. S. 290 (2000) (holding unconstitutional student-initiated and student-led prayer at school football games); Board of Ed. of Kiryas Joel Village School Dist. v. Grumet, 512 U. S. 687 (1994) (invalidating a state law that created a new school district for a single religious community); Lee v. Weisman, 505 U. S. 577 (1992) (prohibiting officially sponsored graduation prayers); County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S. 573 (1989) (holding the display of a créche in a courthouse unconstitutional but allowing the display of a menorah outside a county building); Texas Monthly, Inc. v. Bullock, 489 U. S. 1 (1989) (plurality opinion) (invalidating a sales tax exemption for all religious periodicals); Edwards v. Aguillard, 482 U. S. 578 (1987) (invalidating a law mandating the teaching of creationism if evolution was taught); Estate of Thornton v. Caldor, Inc., 472 U. S. 703 (1985) (invalidating state law that gave employees an absolute right not to work on their Sabbath); Wallace v. Jaffree, 472 U. S. 38 (1985) (invalidating law mandating a daily minute of silence for meditation or voluntary prayer).

 Lemon sets out a three-prong test: “First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the statute must not foster ‘an excessive government entanglement with religion.’” 403 U. S., at 612-613 (citation omitted).

 See also Elk Grove Unified School Dist. v. Newdow, 542 U. S. 1, 26 (2004) (Rehnquist, C. J., concurring in judgment) (“Examples of patriotic invocations of God and official acknowledgments of religion’s role in our Nation’s history abound”); id., at 35-36 (O’Connor, J., concurring in judg *688 ment) (“It is unsurprising that a Nation founded by religious refugees and dedicated to religious freedom should find references to divinity in its symbols, songs, mottoes, and oaths”); Lynch v. Donnelly, 465 U. S., at 675 (“Our history is replete with official references to the value and invocation of Divine guidance”).

 Indeed, we rejected the claim that an Establishment Clause violation was presented because the prayers had once been offered in the Judeo-Christian tradition: In Marsh, the prayers were often explicitly Christian, but the chaplain removed all references to Christ the year after the suit was filed. 463 U. S., at 793-794, and n. 14.

 Other examples of monuments and buildings reflecting the prominent role of religion abound. For example, the Washington, Jefferson, and Lincoln Memorials all contain explicit invocations of God’s importance. The apex of the Washington Monument is inscribed “Laus Deo,” which is translated to mean “Praise be to God,” and multiple memorial stones in the monument contain Biblical citations. The Jefferson Memorial is engraved with three quotes from Jefferson that make God a central theme. Inscribed on the wall of the Lincoln Memorial are two of Lincoln’s most famous speeches, the Gettysburg Address and his Second Inaugural Address. Both inscriptions include those speeches’ extensive acknowledgments of God. The first federal monument, which was accepted by the United States in honor of sailors who died in Tripoli, noted the dates of the fallen sailors as “the year of our Lord, 1804, and in the 28 year of the independence of the United States.”

 See also Edwards v. Aguillard, 482 U. S., at 593-594; Lynch v. Donnelly, 465 U. S., at 677-678; id., at 691 (O’Connor, J., concurring); County of Allegheny v. American Civil Liberties Union, Greater Pittsburgh Chapter, 492 U. S., at 652-653 (Stevens, J., concurring in part and dissenting in part); Stone v. Graham, 449 U. S. 39, 45 (1980) (Rehnquist, J., dissenting).

 Nor does anything suggest that Stone would extend to displays of the Ten Commandments that lack a “plainly religious,” “pre-eminent purpose,” id., at 41. See Edwards v. Aguillard, supra, at 593-594 (“[Stone] did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization”). Indeed, we need not decide in this case the extent to which a primarily religious purpose would affect our analysis because it is clear from the record that there is no evidence of such a purpose in this case.