KUHN, J.,
concurring.
| íThis case presents a question considered before in People v. Philips (N.Y. Ct. Gen. Sess. 1813), i.e., “whether a Roman Catholic Priest can in any case be justifiable in revealing the secrets of a sacramental confession?” In that landmark case, addressing freedom of religion and the priest-penitent evidentiary privilege, defendant Phillips and his wife were indicted for a misdemeanor of receiving stolen goods. Upon being questioned by the authorities, the person whose property had been stolen reported that he had received the restitution of his. effects from the hands of his pastor, Reverend Anthony Kohlmann. William Sampson, The Catholic Question in America (1813) (reporting People v. Philips, supra.), Vol. 1. p. 5. When the Reverend Pastor was summoned and questioned, he excused himself from answering questions touching the restitution of the goods and the persons involved. Id. When the matter was sent to the Grand Jury, the Reverend Pastor was subpoenaed to attend, but he respectfully declined to answer the questions. The matter proceeded to trial, where the Reverend Pastor again sought to be excused. The ministerial basis for the Reverend Pastor’s request that the Court excuse him from testifying is set forth in detail below, in pertinent part:
Were I summoned to give evidence as a private individual (in which capacity I declare most solemnly, I know nothing relatively to the case before the court) and to testify from those ordinary sources of information from which the witnesses present have derived theirs, I should not for a moment hesitate, and should even deem it a duty of conscience to declare whatever knowledge I might have; as, it cannot but be in the recollection of this same honorable Court, I did, not long since, on a difference occasion, because my holy religion teaches *738 and commands me to subject to the higher powers in civil matters, and to respect and obey them. But if called upon to testify in quality of a minister of a sacrament, in which my God himself has enjoined on me a perpetual and inviolable secrecy, I must declare to this honorable Court, that I cannot, I must not answer any question that has a bearing upon the restitution in question; and that it would be my duty to prefer instantaneous death or any temporal misfortune, rather than disclose the name of the penitent in question. For, were I to act otherwise, I should become a traitor to my church, to |2my sacred ministry and to my God. In fíne, I should render myself guilty of eternal damnation.
Lest this open and free declaration of my religious principles should be construed into the slightest disrespect to this honorable Court, I must beg leave again to be indulged in stating as briefly as possible, the principles on which this line of conduct is founded. I shall do this with the greater confidence, as I am speaking before wise and enlightened judges, who, I am satisfied, are not less acquainted with the leading doctrines of the Catholic Church, than with the spirit of our mild and liberal Constitution.
The question now before the court is this: Whether a Roman Catholic Priest can in any case be justifiable in revealing the secrets of sacramental confession? I say, he cannot: the reason whereof must be obvious to everyone acquainted with the tenets of the Catholic Church respecting the sacraments. For it is, and ever was a tenet of the Catholic Church, that Jesus Christ, the divine Founder of Christianity, has instituted seven sacraments, neither more nor less. It is likewise an article of our faith, that the sacrament of penance, of which sacramental confession is a component part, is one of the said seven sacraments. It is, in fine, the doctrine of the Catholic Church that the same divine Author of the sacraments has laid the obligation of a perpetual and inviolable secrecy on the minister of said sacrament.
This obligation of inviolable secrecy enjoined on the minister of the sacrament of penance is of divine institution as well as confession itself: it naturally flows from the very nature of this sacrament, and is so essentially connected with it, that it cannot subsist without it. For, when the blessed Savior of mankind instituted the sacrament of penance, as the necessary means for the reconciliation of the sinner, fallen from the grace of baptism by mortal sin, he unquestionably did it with the intention, that it should be frequented and resorted to be the repenting sinner. Now, it is self evident, that if Christ our Lord had not bound down his minister in the sacrament of penance to a strict and perpetual silence, it would be wholly neglected and abandoned; for we want neither great learning nor deep sense to conceive, that, in that supposition, the last of the temptations of a sinner would be to reveal all his weaknesses and most hidden thoughts to a sinful man like himself, and one perhaps in many respects inferior to himself, and whom he knows to be at full liberty to divulge and disclose whatever may be intrusted to him. In short, the thing speaks for itself: Christ the incarnate Wisdom of God would have manifestly demolished with one hand, what he was erecting with the other; unless we believe that he has affixed by a divine and most sacred law the seal of inviolable secrecy, to all and every part and circumstance of what is communicated to his minister through the channel of confession.
*739 If therefore, I or any other Roman Catholic Priest (which God forbid, and of which Church History during the long lapse of eighteen centuries scarce ever furnished an example) if, I say, I should so far forget my sacred ministry, and become so abandoned as to reveal either directly or indirectly, any part of what has been entrusted to me in the sacred tribunal of penance, the penalties to which I should thereby subject myself, would be these: 1st. I should forever degrade myself in the eye of the Catholic Church, and I hesitate not to say, in the eye of every man of sound principle: the world would justly esteem me as a base and unworthy wretch, guilty of the most heinous prevarication a 13priest can possibly perpetrate, in breaking through the most sacred laws of his God, of nature, and of his Church.
2dly. According to the canons of the Catholic Church I should be divest of my sacerdotal character, replaced in the condition of a Layman, and forever disable from exercising any of the Ecclesiastical functions.
3dly. Conformably to the same canons, I should deserve to be lodged in close confinement, shut up between four walls to do penance during the remainder of my life.
4thly. Agreeably to the dictates of my conscience, I should render myself guilty, by such a disclosure, of everlasting punishment in the life to come.
Having thus briefly stated to this honorable Court, my reasons for not answering the questions of the Attorney General, in the present instance, I trust they will not be found trivial and unsatisfactory.
Id. at p. 8-12. In this posture, the exemption claimed by the Reverend Pastor was raised for the first time in this country. Id. at p. 13. Counsel for the Reverend Pastor urged that the exemption was protected by the New York state constitution and by the common law. With respect to the constitution, he asserted the exemption was secured by the state constitution’s protection of “free exercise and enjoyment of religious profession and worship.” Id. at p. 30. “Every thing essential to that object, is by necessary implication, secured by the constitution; unless it leads to acts of licentiousness, or to practices inconsistent with the peace or safety of the State.” Id. at p. 31. In support of the argument, the rhetorical question was posed, “Is auricular confession dangerous to the peace or safety of the State?” Id. at p. 33. Regarding the common law, the exemption was supported by the known principles that the law would not compel any man to answer a question that subjected him to a penalty or forfeiture, impaired his civil rights, or degraded, disgraced, or disparaged him. Id. at pp. 14 and 36. Counsel urged that man was neither bound to accuse himself of a crime nor was he bound to subject himself to a penalty or forfeiture. Id. at p. 36.[1]
William Sampson, an Irish Protestant lawyer and political exile, argued on behalf of the Clergy and Trustees of St. Peter’s Roman Catholic Church. He urged, in part, |4how our United States Constitution provided explicit authority to support the claimed exemption:
The constitution stands in need of no such illustrations. It is simple, and precise, and unequivocal.... The people whose will it speaks, were not of any one *740 church ... but of many and various sects, all of whom had suffered more or less in Europe for their religious tenets, and many of whom had unrelentingly persecuted each other.... The catholics it is true, bore the hardest burthen of all; but the others would be very sorry, I believe, to put aside our constitution and resume their ancient condition. And God forbid it should be so.... ” [Id. at p. 77.]
The constitution is remediate of many mischiefs, and must be liberally construed. It is also declaratory, and pronounces toleration.... If its authors are yet alive, or if looking down from a happier abode, they have now any care of mortal things, how must they rejoice to see it flourish, to see that all these churches, are but so many temples of one only living God, from whence his worshippers no longer sally forth with tusk and horn to gore each other, but meet like sheep, that are of one shepherd, but of another fold. [Id. at pp. 91-92.]
Finding merit in the positions advanced by the priest and the Catholic Church, the Philips decision,[2] upheld the exemption claimed, finding that the witness and his brethren were “protected by the laws and constitution of this country, in the full and free exercise of their religion.[3] Philips addressed the enquiry at hand as an important one to all religious denominations, and because paraphrasing the Court’s eloquent findings would subtract from its import, I set forth the following excerpts of the Court’s decision:
The question then is, whether a Roman catholic priest shall be compelled to disclose what he has received in confession — in violation of his conscience, of his clerical engagements, and of the canons of his church, and with a certainty of being stripped of his sacred functions, and cut off from religious communion and social intercourse with the denomination to which he belongs.
This is an important enquiry; [i]t is important to the church upon which it has a particular bearing. It is important to ail religious denominations, because it involves a principle which may in its practical operation affect them all....
| fiIt is a general rule, that every man when legally called upon to testify as a witness, must relate all he knows. This is essential to the administration of civil and criminal justice.
But to this rule there are several exceptions — a husband and wife cannot testify against each other, except for personal aggressions — nor can an attorney or counselor, be forced to reveal the communications of his client — nor is a man obliged to answer any question, the answering of which may oblige him to accuse himself of a crime, or subject him to penalties or punishment. [Id. at pp. 96-98].
Whether a witness is bound to answer a question, which may disgrace or degrade him, or stigmatize him by the acknowledgement of offences, which have been pardoned or punished, or by the confession of sins or vices, which may affect the purity of his character, and the respectability of his standing in society, without rendering him obnoxious to punishment, is a question in *741 volved in much obscurity, and about which there is a variety of doctrine, and a collision of adjudications.
After carefully examining this subject, we are of opinion that such a witness, ought not to be compelled to answer. [Id. at p. 99].
[I]n the case now pending, if we decide that the witness shall testify, we prescribe a course of conduct by which he will violate his spiritual duties, subject himself to temporal loss, and perpetrate a deed of infamy....
There can be no doubt but that the witness does consider, that his answering on this occasion, would be such a high handed offence against religion, that it would expose him to punishment in a future state-and it must be conceded by all, that it would subject him to privations and disgrace in this world....
It cannot therefore, for a moment be believed, that the mild and just principles of the common Law would place the witness in such a dreadful predicament; in such a horrible dilemma, between perjury and false swearing: If he tells the truth he violates his ecclesiastical oath— If he prevaricates he violates his judicial oath — Whether he lies, or whether he testifies the truth he is wicked, and it is impossible for him to act without acting against the laws of rectitude and the light of conscience.
The only course is, for the court to declare that he shall not testify or act at all. And a court prescribing a different course must be governed by feelings and views very different from those which enter into the composition of a just and enlightened tribunal, that looks with a propitious eye upon the religious feelings of mankind, and which dispenses with an equal hand the universal and immutable elements of justice. [Id. at pp. 102-08.]
But this is a great constitutional question, which must not be solely decided by the maxims of the common law, but by the principles of our government ...; upon the ground of the constitution, of the social compact, and of civil and religious liberty.
| (-Religion is an affair between God and man, and not between man and man. The laws which regulate it must emanate from the Supreme Being, not from human institutions. Established religions, deriving their authority from man, oppressing other denominations, prescribing creeds of orthodoxy, and punishing non-conformity, are repugnant to the first principles of civil and political liberty, and in direct collision with the divine spirit of Christianity. Although no human legislator has a right to meddle with religion, yet the history of the world, is a history of oppression and tyranny over the consciences of men. And the sages who formed our constitution, with this instructive lesson before their eyes, perceived the indispensable necessity of applying a preventative, that would forever exclude the introduction of calamities, that have deluged the world with tears and with blood, and the following section was accordingly engrafted in our state constitution:
And whereas we are required by the benevolent principles of rational liberty, not only to expel civil tyranny, but also to guard against that spiritual oppression and intolerance, wherewith the bigotry and ambition of weak and wicked princes have scourged mankind, [t]his convention doth further in the name, and by the authority of the good people of this state, ordain, de *742 termine, and declare, that the free exercise and enjoyment of religious profession and worship, without discrimination or preference, shall forever hereafter be allowed within this state, to all mankind. Provided, that the liberty of conscience, hereby granted, shall not be so construed as to excuse acts of licentiousness, or justify practices inconsistent with the peace or safety of this state.
A provision conceived in a spirit of the most profound wisdom, and the most exalted charity, ought to receive the most liberal construction. Although by the constitution of the United States, the powers of congress do not extend beyond certain enumerated objects; yet to prevent the danger of constructive assumptions, the following amendment was adopted: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.” In this country there is no alliance between church and state; no established religion; no tolerated religion — for toleration results from establishment — but religious freedom guaranteed by the constitution, and consecrated by the social compact.
It is essential to the free exercise of a religion, that its ordinances shall be administered — that its ceremonies as well as its essentials should be protected. The sacraments of a religion are its most important elements.
It has been contended that the provision of the constitution which speaks of practices inconsistent with the peace or safety of the state, excludes this case from the protection of the constitution, and authorized’ the interference of this tribunal to coerce the witness. In order to sustain this position, it must be clearly made out that the concealment observed in the sacrament of penance, is a practice inconsistent with the peace or safety of the state.
Ji' ■
There is in fact, no secret known to the priest, which would be communicated otherwise, than by confession — and no evil results from this communication— on the contrary, it may be made the instrument of great good....
The language of the constitution is emphatic and striking, it speaks of acts of licentiousness, of practices inconsistent with the tranquility and safety of the state; it has reference to something actually, not negatively injurious. To acts committed, not to acts omitted— offences of a deep dye, and of an extensively injurious nature: It would be stretching it on the rack so say that it can possibly contemplate the forbearance of a Roman catholic priest, to testify what he has received in confession, or that it could ever consider the safety of the community involved in this question. To assert this as the genuine meaning of the constitution, would be to mock the understanding, and to render the liberty of conscience a mere illusion. It would be to destroy the enacting clause of the proviso — and to render the exception broader than the rule, to subvert all the principles of sound reasoning, and overthrow all the convictions of common sense.
If a religious sect should rise up and violate the decencies of life, by practicing their religious rites, in a state of nakedness; by following incest and a community of wives. If the Hindoo should attempt to introduce the burning of widows on the funeral piles of their deceased husbands, or the Mahometan his plurality of wives, or the Pagan his bacchanalian orgies or human sacrifices. *743 If a fanatical sect should spring up ... and pull up the pillars of society, or if any attempt should be made to establish the inquisition, then the licentious acts and dangerous practices, contemplated by the constitution, would exist, and the hand of the magistrate would be rightfully raised to chastise the guilty agents.
But until men under pretence of religion, act counter to the fundamental principles of morality, and endanger the well being of the state, they are to be protected in the free exercise of their religion. If they are in error, or if they are wicked, they are to answer to the Supreme Being, not to the unhallowed intrusion of frail fallible mortals.
We speak of this question, not in a theological sense, but in its legal and constitutional bearings. Although we differ from the witness and his brethren, in our religious creed, yet we have no reason to question the purity of their motives, or to impeach their good conduct as citizens. They are protected by the laws and constitution of this country, in the full and free exercise of their religion, and this court can never countenance or authorize the application of insult to their faith, or of torture to their consciences.
Id. at pp. 108-114.
Two hundred years after this landmark case was decided, the priest and the Roman Catholic Church invoke the same protected exercise of religion in the matter before this court. And the law protecting freedom of religion remains the same. Thus, our state’s legislature has accordingly provided that a priest is not required to report a ^confidential communication under Louisiana Children’s Code article 609’s mandatory child abuse reporting requirements. Premised on our nation’s bill of rights, the provisions of La. Ch.Code arts. 603(15)(c), 609, and La. C.E. art. 511, collectively acknowledge that the priest is “not required” to report a “confidential communication” made by a person to a priest.[4] To subject a Catholic priest to such mandatory reporting would be clearly violative of the First Amendment of the United States Constitution.
The Religion Clauses of the First Amendment of the United States Constitution provides: “Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.”[5] The first of the two Clauses, commonly called the Establishment Clause, commands a separation of church and state. The second, the Free Exercise Clause, requires government respect for and noninterference with the religious beliefs and practices of our Nation’s people. Cutter v. Wilkinson, 544 U.S. 709, 719, 125 S.Ct. 2113, 2120, 161 L.Ed.2d 1020 (2005). These two Clauses, while expressing complementary values, are frequently in tension. Locke v. Davey, 540 U.S. 712, 124 5.Ct. 1307, 158 L.Ed.2d 1 (2004). The basic purposes of these Clauses, however, are to “assure the fullest possible scope of religious liberty and tolerance for all.” School Dist. of Ahington Township v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), concurring opinion of Justice Goldberg, joined by Justice Harlan.[6]
*744 |9Notably, the role of religion in American life has been officially acknowledged by all three branches of government from at least 1789. Van Orden v. Perry, 545 U.S. 677, 686, 125 S.Ct. 2854, 2861, 162 L.Ed.2d 607 (2005), citing Lynch v. Donnelly, 465 U.S. 668, 104 S.Ct. 1855, 79 L.Ed.2d 604 (1984). Our United States Supreme Court observed in School Dist. of Abington Township v. Schempp, 374 U.S. 208, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963):
It is true that religion has been closely identified with our history and government. ... The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself.... It can be truly said, therefore, that today, as in the beginning, our national life reflects a religious people who, in the words of Madison, are ‘earnestly praying, as ... in duty bound, that the Supreme Lawgiver of the Universe ... guide them into every measure which may be worthy of his [blessing. ...]’ ” Id., at 212-213, 83 S.Ct. 1560.
Our Constitution acknowledges this country’s religious foundation by the use of the phrase, “in the Year of our Lord.” The Declaration of Independence opens with references to “Nature’s God and the “Creator” and closes with an appeal to:the Supreme Judge of the World” and “divine Providence.” Amar, Akhil R. America’s | mUnwritten Constitution: the precedents and principles we live by. New York, Basic Books, 2012. Print.[7]
*745 I acknowledge that the free exercise of religion is not without some government restriction. Where people’s actions are found to be subversive of good order, limitations on such action have been upheld. Braunfeld v. Brown, 366 U.S. 599, 603-04, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961).[8] But here, as recognized in the Philips’ case, the Priest’s compliance with the doctrines of the Roman Catholic Church, i.e., that he not divulge any information obtained during the Sacrament of Reconciliation, is not in anyway subversive of good order and does not otherwise pose any substantial threat to public safety, peace or order; on the contrary, the Church’s doctrines are the foundation of these things. Because the alleged actions of the Priest and the Roman Catholic Church of the Diocese of Baton Rouge are protected by the Free Exercise Clause of the First Amendment, plaintiffs have not set forth a cause of action against them. Accordingly, I concur in the majority’s opinion.

. This concurrence presents only a brief reference to some of the arguments of counsel and of the decision of the Phillips court.

. Mayor De Witt Clinton authored the opinion of the court.

. Because there was no evidence against the defendants in the Phillips case, they were acquitted. Id. atp. 114.

. These statutes cannot be interpreted without contemplating their Constitutional underpinnings.

. Likewise, La. Const, art. 1, § 8, provides, "No law shall be enacted respecting an establishment of religion or prohibiting the free exercise thereof.”

. Relevant to this point is the following pertinent excerpt from "A Letter Concerning Toleration” by John Locke, 1689:
*744 The toleration of those that differ from others in matters of religion is so agreeable to the Gospel of Jesus Christ, and to the genuine reason of mankind, that it seems monstrous for men to be so blind as not to perceive the necessity and advantage of it in so clear a light.... [H]owever, that some may not color their spirit of persecution and unchristian cruelty with a pretence of care of the public weal and observation of the laws; ... I esteem it above all things necessary to distinguish exactly the business of civil government from that of religion and to settle the just bounds that lie between the one and the other....
It is the duty of the civil magistrate, by the impartial execution of equal laws, to secure unto all the people in general and to every one of his subjects in particular the just possession of these things belonging to this life. If anyone presume to violate the laws of public justice and equity, established for the preservation of those things, his presumption is to be checked by the fear of punishment, consisting of the deprivation or diminution of those civil interests, or goods, which otherwise he might and ought to enjoy....
In the second place, the care of souls cannot belong to the civil magistrate, because his power consists only in outward force; but true and saving religion consists in the inward persuasion of the mind, without which nothing can be acceptable to God....
In the third place, the care of the salvation of men’s souls cannot belong to the magistrate.... In the variety and contradiction of opinions in religion, wherein the princes of the world are as much divided as in their secular interest, ... one country alone would be in the right, and all the rest of the world put under an obligation of following their princes in the ways that lead to destruction.... [M]en would owe their eternal happiness or misery to the places of their nativity.
These considerations ... seem unto me sufficient to conclude that all the power of civil government relates only to men's civil interests, is confined to the care of the things of this world, and hath nothing to do with the world to come.

. The First Prayer of the Continental Congress, 1774, The Office of the Chaplain, United States House of Representatives petitioned, the "Lord our Heavenly Father,” "high and mighty King of kings,” "Lord of lords,” "O God of wisdom,” and "Jesus Christ, Thy Son and our Savior” to “direct the councils of this honorable assembly” to "enable them to settle things on the best and surest foundation.”

. In Braunfeld, 366 U.S. at 604, 81 S.Ct. 1144, the Court noted that Thomas Jefferson articulated this general point that legislative power may reach people's actions when they are found to be in violation of important social duties in stating, as follows:
Believing with you that religion is a matter which lies solely between man and his God, that he owes account to none other for his faith or his worship, that the legislative powers of government reach actions only, and not opinions, I contemplate with sovereign reverence that act of the whole American people which declared that their legislature should ‘make no law respecting an establishment of religion, or prohibiting the free exercise thereof,’ thus building a wall of separation between church and State. Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore to man all his natural rights, convinced he has no natural right in opposition to his social duties.
8 Works of Thomas Jefferson 113.
The Braunfeld Court also referenced the words of Oliver Ellsworth, a member of the Constitutional Convention and later Chief Justice, who wrote:
But while I assert the rights of religious liberty, I would not deny that the civil power has a right, in some cases, to interfere in matters of religion. It has a right to prohibit and punish gross immoralities and impieties; because the open practice of these is of evil example and detriment. Emphasis added. Written in the Connecticut Courant, Dec. 17, 1787, as quoted in 1 Stokes, Church and State in the United States, 535.
Braunfeld, 366 U.S. at 604-605, 81 S.Ct. at 1146.