WILKINSON, Circuit Judge,
dissenting:
Welcome to the meeting of the Rowan County Board of Commissioners. As many of you are aware, we customarily begin these meetings with an invocation. Those who deliver the invocation may make reference to their own religious faith as you might refer to yours when offering a prayer. We wish to emphasize, however, that members of all religious faiths are ivelcome not only in these meetings, but in our community as well. The participation of all our citizens in the process of self-government will help our fine county best serve the good people who live here.
—Message of Religious Welcome
The message actually delivered in this case was not one of welcome but of exclusion. That is a pity, because even .a brief prefatory statement akin to that above might have helped to set a different tone for the meetings here while not requiring the judiciary to police the content of legislative prayer.
I.
Religious faith is not only a source of personal guidance, strength, and comfort. Its observance is also a treasured communal exercise which serves in times of need as the foundation for mutual support and charitable sustenance. But when a seat of government begins to resemble a house of worship, the values of religious observance are put at risk, and the danger of religious division rises accordingly. S.A. 1-10 (affidavits of Nancy Lund, Liesa Montag-Siegel, and Robert Voelker). This, I respectfully suggest, is what is happening here. It cannot be right. This case ,is more- than a factual wrinkle on Town of Greece v. Galloway, — U.S. —, 134 S.Ct. 1811, 188 L.Ed.2d 835 (2014). It is a conceptual world apart.
Rowan County’s prayer practice featured invocations week after week, month after month, year after year, with the same sectarian references. To be sure, Town of Greece ruled that sectarian prayer is not by itself unconstitutional. 134 S.Ct. at 1820-23. But the issue before us turns on more than just prayer content, the primary concern in Town of Greece. Whereas guest ministers led prayers in that case, it was public officials who exclusively delivered the invocations in Rowan County. Those prayers served to open a meeting of our most basic' unit of government, a local board of commissioners that passes laws affecting citizens in the most daily aspects of their lives. The prayers, bordering at times on exhortation or pros-elytization, were uniformly sectarian, referencing one and only one faith though law by definition binds us all.
I have seen nothing like it. This combination of legislators as the sole prayer-givers, official invitation for audience participation, consistently sectarian prayers referencing but a single faith, and the intimacy of a local governmental setting exceeds even a broad reading of Town of Greece. That case in no way sought to dictate the outcome of every legislative prayer case. Nor did it suggest that “no constraints remain on [prayer] content.” Id. at 1823. The Establishment Clause still cannot play host to prayers that “over time ... denigrate nonbelievers or religious minorities, threaten damnation, or preach conversion.” Id. To assess those risks, *432 “[c]ourts remain free to review the pattern of prayers over time.” Id. at 1826-27. •
Above all, the Supreme Court stressed that “[t]he inquiry [into legislative prayer] remains a fact-sensitive one that considers both the setting in which the prayer arises and the audience to whom it is directed.” Id. at 1826 (emphasis added). The parties have not cited any legislative prayer decision combining the particular speakers, audience involvement, prayer content, and local government setting presented here. Rowan County’s counsel conceded during oral argument that this case is without precedent. Oral Argument at 9:20-10:08, Lund v. Rowan Cty. (No. 15-1591). I am left to wonder what limits, if any, to sectarian invocations at meetings of local government appellants would be prepared to recognize.
No one disputes that localities enjoy considerable latitude in opening their meetings with invocations and prayers. But the legislative prayer practice here pushes every envelope. I would not welcome this exceptional set of circumstances into the constitutional fold without considering its implications. A ruling for the County bears' unfortunate consequences for American pluralism, for a nation whose very penny envisions one out of many, a nation whose surpassing orthodoxy belongs, in its constitutional respect for all beliefs and faiths, a nation which enshrined in the First and Fourteenth Amendments the conviction that diversity in all of its dimensions is our abiding strength.
II.
Though the majority treats this case as all but resolved by Town of Greece, that decision did not touch upon the combination of factors presented here, particularly the question of legislator-led prayer. Indeed, prayers by public officials form a distinct minority within Establishment Clause case law. The great majority of legislative prayer cases have not involved legislators at all, but invocations by guest ministers or local religious leaders. E.g., Marsh v. Chambers, 463 U.S. 783, 784-85, 103 S.Ct. 3330, 77 L.Ed.2d 1019 (1983) (invocation by a chaplain paid by the state at the opening of state legislative sessions); Joyner v. Forsyth Cty., 653 F.3d 341, 343 (4th Cir. 2011) (prayers by leaders of local congregations at county commission meetings). The invocations in Town of Greece were likewise delivered solely by ministers from local congregations. 134 S.Ct. at 1816-17. Nearly all the congregations were Christian, and every minister selected during an eight-year period came from that faith. Id. But crucially, no public officials delivered prayers or influenced their content in any way. Id. As the district court noted, Town of Greece “consistently discussed legislative prayer practices in terms of invited ministers, clergy, or volunteers providing the prayer, and not once described a situation in which the legislators themselves gave the invocation.” Lund, 103 F.Supp.3d at 722.
By contrast, the only eligible prayer-givers at Rowan County commission meetings were the five board commissioners, each of whom took up the responsibility in turn. Not only did they lead the prayers, but they also composed all the invocations “according to their personal faiths,” which were uniformly Christian denominations. Id. at 724; J.A. 275-94 (affidavits of the five Rowan County commissioners). Compared to Town of Greece, the “much greater and more intimate government involvement” by the Rowan County board led the district court to find its prayer practice unconstitutional. Lund, 103 F.Supp.3d at 723.
Of course, the prayer practice was not infirm simply because it was led by the commissioners. Ás the majority and the states’ amicus brief rightly remind, there *433 exists a robust tradition of prayers delivered by legislators. According to a national survey and amici’s own research, all but two state legislative bodies engage in legislative prayer or a moment of silence. Br. of Amici Curiae State of West Virginia and 12 Other States at 13. Lawmakers lead at least some legislative prayers in just, over half of those states, including seven of the ten state legislative chambers within our circuit. Id at 13-14. Many county and city governments also call upon elected officials to give prayer. Id. at 15.
The tradition of prayer by legislators is but one indicator of how unrealistic it would be to divorce democratic life from religious practice. We see their intertwined nature whenever candidates for all levels of political office proclaim their faith on the campaign trail. Voters may understandably wish to factor the religious devotion of those they elect into their political assessments. It could not be otherwise. As Justice William 0. Douglas aptly observed, “We are a religious people whose institutions presuppose a Supreme Being.” Zorach v. Clauson, 343 U.S. 306, 313, 72 S.Ct. 679, 96 L.Ed. 954 (1952).
The Supreme Court thus •' recognized that “a moment of prayer or quiet reflection sets the mind[s] [of legislators] to a higher purpose and thereby eases the task of governing.” Town of Greece, 134 S.Ct. at 1825. The solemnizing effect for lawmakers is likely heightened when they personally utter the-prayer. In deference-.to that purpose, I would not for a moment cast all legislator-led prayer as constitutionally suspect. As the Supreme. Court has emphasized, • “[Legislative prayer lends gravity to public business, reminds lawmakers to transcend petty differences in pursuit of a higher purpose, and expresses a common aspiration to a just and peaceful society.” Id. at 1818.
Prayers delivered by legislators, however, are themselves quite diverse. We cannot discern from the general survey proffered by amici which prayers were primarily for the benefit of legislators or commissioners as in Town of Greece and which focused, as the prayers did here, on requesting the citizens at the meeting to pray. Nor do we know from the survey what percentage of prayers given by elected -officials generally contain sectarian references or proselytizing exhortations, or which are non-denominational or delivered by legislators of diverse faiths. And-in fact, the very survey on which the majority and amici rely takes care to note that highly sectarian prayers represent “not only a breach of etiquette,” but also an “insensitivity to the faith of others.” National Conference of State Legislatures, Inside the Legislative Process 5-145 (2002) [hereinafter N’CSL Survey]; see Maj. Op. at 419; Br. of Amici Curiae State of West Virginia and 12 Other States at 13. Further, the survey cautions, the prayer-giver “should be especially sensitive to expressions that may be unsuitable • to members of some faiths.” NCSL Survey at 5-146.
We should focus then not on any general survey but on the interaction amóng elements specific to this • case — legislative prayer-givers exclusively of one faith, legislative- invitation to the citizens before them to participate, and exclusively sectarian prayers referencing a single faith in every regular meeting of a local governing body over a period of many years. At a certain point, the interaction of these elements rises to the level of coercion that Town of Greece condemned. Id. at 1823.
III.
A.
I shall discuss each of the aforementioned elements in turn, beginning with the *434 fact that the commissioners themselves delivered the invocations. Legislator-led prayer, when combined with the other elements, poses a danger not present when ministers lead prayers. The Rowan County commissioners, when assembled in their regular public meetings, are the very embodiment of the state. From November 2007, when the county began recording its board meetings, to the start of this lawsuit in March 2013,139 out of 143 meetings, or 97%, began with legislators delivering prayers explicitly referencing Christianity. Lund, 103 F.Supp.3d at 714; see also Lee v. Weisman, 505 U.S. 577, 588, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (defining sectarian prayer as “us[ing] ideas or images identified with a particular religion”). The vast majority of those 139 prayers closed with some variant of “in Jesus’ name.” S.A. 12-38 (transcript of all Rowan County prayers on record). Only four invocations, given by the same now-retired commissioner, were non-sectarian, J.A. 296 & n.2, and no prayer mentioned a religion other than Christianity in five-and-a-half years, Lund, 103 F.Supp.3d at 714.
The five commissioners, all Christian, “maintain[ed] exclusive and complete control over the content of the prayers.” Lund, 103 F.Supp.3d at 733. At times, the prayers seemed to blend into their legislative role. As one commissioner put it, “Lord, we represent you and we represent the taxpayers of Rowan County.” S.A. 16. When the state’s representatives so emphatically evoke a single religion in nearly every prayer over a period of many years, that faith comes to be perceived as the one true faith, not merely of individual prayer-givers, but of government itself. The board’s rules and regulations bind residents of all faiths, Christian, Hindu, Jewish, Muslim, and many other believers and non-believers as well. And yet those laws that govern members of every faith are passed in meetings where government overtly embraces only one. That singular embrace runs up against “[t]he clearest command of the Establishment Clause,” that “one religious denomination cannot be officially preferred over another.” Larson v. Valente, 456 U.S. 228, 244, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982).
An equally clear command is that “each separate government in this country should stay out of the business of writing or sanctioning official prayers.” Engel v. Vitale, 370 U.S. 421, 435, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962). Town of Greece echoed that principle even as it upheld legislative prayer: “Our Government is prohibited from prescribing prayers to be recited in our public institutions in order to promote a preferred system of belief or code of moral behavior.” 134 S.Ct. at 1822. These age-old warnings have apparently fallen on deaf ears here. By instituting its elected officials as the sole proclaimers of the sole faith, Rowan County is elbow-deep in the activities banned by the Establishment Clause — selecting and prescribing sectarian prayers. Although the county contends that the prayer practice reflects only the desire of individual members of the board, Appellant’s Reply Br. at 8-9, it is hard to believe that a practice observed so uniformly over so many years was not by any practical yardstick reflective of board policy.
Further, the prayer-giver’s identity affects the range of religions represented in legislative prayer. Because only commissioners could give the invocation, potential prayer-givers in Rowan County came from a “closed-universe” dependent solely on electoral outcomes. Lund, 103 F.Supp.3d at 723. Appellant frames this as a benefit. The election process, it says, which welcomes candidates of all faiths or no faith, holds greater promise of diversity than the selection of ministers by government officials, which, the county points out, resulted *435 in the same chaplain for sixteen years in the case of Marsh v. Chambers. Appellant’s Br. at 26.
But the county is comparing apples and oranges. While a small group of legislators can diversify their appointment of prayer-givers at will, it may be more difficult to expect voters to elect representatives of minority religious faiths. For instance, after residents in the town of Greece complained about the pervasive Christian prayers, local officials granted a Jewish layman, a Baha’i practitioner, and a Wic-can priestess the opportunity to lead prayers. Town of Greece, 134 S.Ct. at 1817. The Court took comfort in the fact that “any member of the public is welcome in turn to offer an invocation reflecting his or her own convictions.” Id. at 1826. But no guest ministers or clergy and no member of the public delivered.an invocation here, that being reserved for the commissioners belonging to the faith that dominates the electorate.
Entrenching this single faith reality takes us one step closer to a de facto religious litmus test for public office. When delivering the same sectarian prayers becomes embedded legislative custom, voters may wonder what kind of prayer a candidate of a minority religious persuasion would select if elected. Failure to pray in the name of the prevailing faith risks becoming a campaign issue or a tacit political debit, which in turn deters those of minority faiths from seeking office. It should not be so.
None of this is to imply a need for “religious- balancing” among candidates, elected officials, or legislative prayers. Id. at 1824. Without going so far, we still must contend with the far-reaching implications of an unremitting record-overwhelmingly sectarian prayers led solely by legislators through many meetings over many years. No single aspect or consequence of this case alone creates an Establishment Clause problem. Rather, it is the combination of the, role of the commissioners, their instructions to the audience, their invocation of a single faith, and the local governmental setting that threatens to blur the line between church and state to a degree unimaginable in Town of Greece.
B.
That brings us to the second problematic element in this case: the fact that the prayers of the commissioners were preceded by a request or encouragement for audience participation. Town of Greece reminds us to look to the effect of legislative prayer on the audience, not merely the actions of the prayer-givers. See 134 S.Ct. at 1826-26. Here the effect is apparent. The attendees at Rowan County board meetings, upon hearing the invocations uttered by the state’s representatives day in and day out, must have grasped the obvious: the Rowan County commission favors one faith and one faith only. In the eyes and ears of the attendees, that approval sets the tone for the meetings to follow. As expressed by one plaintiff in this case, “[T]he prayers sent a message that the County and Board favors Christians and that non-Christians, like [her], are outsiders.” S.A. 6 (affidavit of Liesa Montag-Siegel).
This message was amplified by frequent exhortations. Commissioners spoke directly to the attendees during prayer, asking them to stand and leading with phrases like “Let us pray” or “Please pray with me.” Lund, 103 F.Supp.3d at 714, 727. The record reflects that the great majority of attendees did in fact “join the Board in standing and bowing their heads,” id. at 714, and that plaintiffs themselves “[a]s a result of the [Board] Chair’s instructions” felt “compelled to stand” so that they would-not stand out, S.A.-1-10 (plaintiffs’ *436 affidavits). When reviewing phrases like “Let us piay” or “Please pray with me,” Town of Greece underscored that the requests “came not from town leaders but from the guest ministers.” 134 S.Ct. at 1826. The Court' noted that its “analysis would be different if town board members directed the public to participate in the prayers.” Id. (emphasis added). Here they did. “[T]he Board’s statements,” the district court noted, “fall squarely within the realm of soliciting, asking, requesting, or directing ... of concern to the Town of Greece plurality.” Lund, 103 F.Supp.3d at 728.
A request to an audience to stand or pray carries special weight when conveyed in an official capacity by an elected commissioner facing his constituents, with his board arrayed behind or beside him, directly before discharging his official duties. Id. County board decisions affect both property and livelihood, including zoning laws and variances, school funding, police protection, fire prevention and sanitation budgets, and the location of parks and other areas of recreation. Br. of Amici Curiae Religious Liberty Orgs. at 25. I do not at all suggest that commissioners would base their decisions on who prays and who doesn’t. I do note, however, that the close proximity of participatory sectarian exercises to citizen petitions for the many benefits that local boards can withhold or dispense presents, to say the least, the opportunity for abuse.
C.
Nothing about the constitutional di’aw-backs of Rowan County’s prayer practice should be construed as disparaging the prayers themselves, which were moving and beautiful on many levels. Each invocation was luminous in the language that many millions of Americans have used over many generations to proclaim the Christian faith. The constitutional challenge directed at the invocations is in mo sense a commentary on the worth and value of prayer or on the.devotion of the citizens of Rowan County and their elected officials to their faith.
The prayers here, which would be so welcome in many a setting, cannot be divorced from the proceedings in which they were spoken. It is not the prayers but the context that invites constitutional scrutiny. Establishment Clause questions are by them nature “matter[s] of degree,” which indicates some acceptable practices and others that cross the line. Van Orden v. Perry, 545 U.S. 677, 704, 125 S.Ct. 2854, 162 L.Ed.2d 607 (2005) (Breyer, J., concurring in judgment). For the average citizen of Rowan County, these meetings might well have been the closest interaction he or she would have with government at any level. To reserve that setting for an embrace of one and only one faith over a period of years goes too far.
This is especially so where'prayers have on occasion veered from -invocation to proselytization. Even with the greater latitude afforded in Town of Greece, legislative prayer still cannot be “exploited to proselytize or advance any one ... faith or belief.” 134 S.Ct. at 1823 (quoting Marsh, 463 U.S. at 794-95, 103 S.Ct. 3330). Plaintiffs, all non-Christians, cited examples that they found overtly sectarian or proselytizing:
• “As we get ready to celebrate the Christmas season, we’d like to thank you for the Virgin Birth, we’d like to thank.you for the Cross at Calvary, and we’d like to thank you for the resurrection. Because we do believe that there is only one way to salvation, and that is Jesus Christ.” J.A. 16 (prayer of December 3, 2007).
• “Our Heavenly Father, we will never, ever forget that we are not alive un *437 less your life is in us. We are the recipients of your'immeasurable grace. We can’t be defeated, we can’t be destroyed, and we won’t be denied, because of our salvation through the Lord Jesus Christ. I ask you to be with us as we conduct the business of Rowan County this evening, and continue to bless everyone in this room, our families, our friends, and our homes. I ask all these things in the name of Jesus, Amen.” Id. (prayer of May 18, 2009).
• “Let us pray. Holy Spirit, open our hearts -to Christ’s teachings, and enable us to spread , His , message amongst the people we know and love through the applying of the sacred words in our everyday lives. In Jesus’ name I pray. Amen.” Id. at 17 (prayer of March 7, 2011).
• “Let us pray. Merciful God,, although you made all people in your image, we confess that we live with deep division. Although you sent Jesus to be Savior of the world, we confess that we treat Him as our own personal God. Although you are one, and the body of Christ is one, we fail to display that unity in our worship, our mission, and our fellowship. Forgive our pride and arrogance, heal our souls, and renew our vision. For the sake of your Son, our Savior, the Lord Jesus Christ, Amen.” Id (prayer of October 3, 2011).
The point here is not to pick apart these prayers or to measure objectively their proselytizing content. It is to consider how this language might fall on the ears of Hindu attendees, Jewish attendees, Muslim attendees, or others who do not share the commissioners’ particular view of salvation or their religious beliefs. It is not right to think that adherents of minority faiths are “hypersensitive,” Maj. Op. at 422. If we Christians were a religious minority; we would surely be sensitive to the invariable commencement of town hall meetings through invocation of a faith to which we did not subscribe. And if religious faith was not a matter of sensitivity, then why would two of our Constitution’s best known and most prominent provisions have been devoted to it?
'' The invocations here can sound like an invitation to take up the tenets of Christian doctrine. And an invitation can take on tones' of exhortation when issued from the lips of county leaders. Although those attending the board meeting may have “had several options available — they could arrive after the invocation, leave for the duration of the prayer, or remain for the prayer without participating,” maj. op. at 428, such options served only to marginalize.
Indeed, to speak of options masks important differences. People often go to church or join groups and organizations out of a sense of choice. It is the faith they have chosen or it is a group to which they wish to belong. But people often go to local government meetings in their capacity as citizens in order to assert their views or defend their rights vis-a-vis an entity with legal and coercive powers. These are two very different forms of attendance. In board meetings, it fell to non-Christian attendees, facing their elected representatives and surrounded by bowed heads, to choose “between staying seated and unobservant, or acquiescing to the prayer practice.” Lund, 103 F.Supp.3d at 732. It is no trivial choice, involving, as it does, the pressures of civic life and the intimate precincts of the spirit.
The Rowan County board can solemnize its- meetings without creating such tensions. The desire of this fine county for prayer at the opening of its public sessions can be realized in many ways, such as nondenominational prayers or diverse prayer- *438 givers. Another possibility, open to legislators of any faith, might be the Message of Religious Welcome described above. Such an expression of religious freedom and inclusion would promote the core idea behind legislative prayer, “that people of many faiths may be united in a community of tolerance and devotion.” Town of Greece, 134 S.Ct. at 1823. A Message of Religious Welcome separate from the invocation itself also reduces the risk that courts will “act as supervisors and censors” of prayer language, a major concern voiced by the Supreme Court. M. at 1822. Indeed, the availability of so many inclusive alternatives throws into relief the unfortunate confluence of factors in the county’s practice. For the county to insist on uniformly sectarian prayer led by legislators of one faith in a closed and purely governmental space carries us far from the central premise of the Establishment Clause.
IV.
By pairing the Free Exercise Clause with the Establishment Clause in the First Amendment, the Framers struck a careful balance. Americans are encouraged to practice and celebrate their faith but not to establish it through the state. See Engel, 370 U.S. at 429-34, 82 S.Ct. 1261 (discussing the historic roots of the Establishment Clause as it relates to the Free Exercise Clause). This seems an inapt moment to upset that ancient balance. The violent sectarian tensions in the Middle East are only the most visible religious divisions now roiling the globe. Are such levels of hostility likely here? Probably not, but it behooves us not to take our relative religious peace for granted and to recognize that the balance struck by our two great religion clauses just may have played a part in it. In venues large and small, a message of religious welcome becomes our nation’s great weapon, never to be sheathed in this or any other global struggle. Believing that legislative prayer in Rowan County can further both religious exercise and religious tolerance, I respectfully dissent.